[Cite as *State v. Siple*, 2023-Ohio-1980.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | JUDGES:<br>Hon. William B. Hoffman, P.J. |
| Plaintiff-Appellee | Hon. Patricia A. Delaney, J.<br>Hon. Craig R. Baldwin, J. |
| -vs- | |
| | Case No. 2022CA00092 |
| ANTHONY SIPLE | |
| Defendant-Appellant | O P I N I O N |


CHARACTER OF PROCEEDINGS:     Appeal from the Stark County Court of
                              Common Pleas, Case No. 2021CR1869A


JUDGMENT:                     Affirmed

DATE OF JUDGMENT ENTRY:       June 15, 2023


APPEARANCES:


For Plaintiff-Appellee                    For Defendant-Appellant

KYLE L. STONE                             JACOB T. WILL
Prosecuting Attorney                      121 S. Main Street – Suite #520
Stark County, Ohio                        Akron, Ohio 44308

VICKI L. DeSANTIS
Assistant Prosecuting Attorney
Appellate Division
110 Central Plaza South – Suite #510
Canton, Ohio 44702-1413

*Hoffman, P.J.*

**{¶1}** Defendant-appellant Anthony Siple appeals his convictions and sentence entered by the Stark County Court of Common Pleas, on one count of pandering sexually-oriented material, one count of sexual battery, and one count of assault, following a jury trial. Plaintiff-appellee is the state of Ohio.

STATEMENT OF THE CASE AND FACTS

**{¶2}** On October 29, 2021, the Stark County Grand Jury indicted Appellant on one count of rape, in violation of R.C. 2907.02(A)(1)(c) and (B), a felony of the first degree; one count of felonious assault, in violation of R.C. 2903.11(A)(1) and (D)(1)(a), a felony of the second degree; one count of pandering sexually-oriented matter involving a minor or impaired person, in violation of R.C. 2907.322(A)(1), a felony of the third degree; and one count of sexual battery, in violation of R.C. 2907.03(A)(2), a felony of the third degree. Appellant appeared before the trial court for arraignment on November 5, 2021, and entered a plea of not guilty to the Indictment.

**{¶3}** The matter proceeded to jury trial on May 24, 2022. The following evidence was adduced at trial.

**{¶4}** R.M., the Victim's 19-year-old daughter, testified, at approximately 3:00 a.m. on August 14, 2021, she was awakened by the sound of the Victim's screams. R.M. went downstairs and found the Victim, whom R.M. described as "very, very emotional." Trial Transcript, Volume 2, at 34. R.M. continued, "[The Victim] was intoxicated. And she had a big black eye, she had a busted lip." *Id.* R.M. asked the Victim why she was crying. The Victim responded Appellant, who lived next door, had beaten her up. R.M. called 9-1-1.

{¶5}    R.M. explained the Victim is an alcoholic and she has seen the Victim intoxicated before.  R.M. added she had never observed the Victim as intoxicated as she was on that morning and the situation was unusual.

{¶6}    The Victim testified she, her mother, and her daughter have lived at the residence on West Summit Street, Alliance, Ohio, for 15 years.  The Victim stated she had known Appellant for a few weeks prior to August 14, 2021.  The Victim went to Appellant's residence late in the evening on August 13, 2021.  Another man was at the residence with Appellant.  Although the Victim had seen the man before, she did not know his name.  The Victim admitted she had been drinking vodka prior to go to Appellant's house.  The Victim thought she brought alcohol with her, but could not recall how much she drank.  When asked what she remembered about the evening, the Victim stated, "I just remember going over there, walking in the door, sitting down.  And then that's about all I remember until I woke up and he was punching me in the face. And * * * then he just kept punching me, kicking me out the door. That's all I remember." *Id.* at 43.  The Victim testified she did not have any recollection of what happened that night.

{¶7}    After Appellant kicked her out of his house, the Victim ran screaming across the street to her house.  The Victim stated she sustained numerous physical injuries, including two black eyes, a large knot on her forehead, bruising over her whole body, and marks on her neck.  The Victim repeated she had known Appellant for a couple of weeks and added they had engaged in sexual activity during that time.  The Victim indicated she did not go to Appellant's home that evening to engage in sexual activity with him.

{¶8}    On cross-examination, counsel for Appellant played the cell phone video of the Victim and Appellant engaged in sexual activity.  After watching the video, the Victim

acknowledged she did not tell Appellant "No" or tell him to stop. The Victim recalled she and Appellant had a fight after they had sex, but could not remember how it started. She only remembered Appellant repeatedly punching her in the face and repeatedly kicking her while she was on the ground.

{¶9} On redirect examination, the Victim testified she heard herself on the video saying "all right, I'm done" and "no, I don't want to be here." Tr. at 64. As the Victim watched the video, she knew she was not in control of her faculties at the time.

{¶10} Patrolman Sean Mark with the City of Alliance Police Department was dispatched to 662 Summit Street for a medical emergency following a disturbance. When Patrolman Mark arrived, he observed the Victim bleeding from her eyes, nose, and mouth. The Victim's right eye was completely swollen shut and her left eye was almost swollen shut. The Victim informed Patrolman Mark she had been across the street at a neighbor's house. The Victim was very intoxicated and could not remember everything that happened. The Victim eventually told the officer she was struck in the face several times, punched, and choked. Patrolman Mark called for another officer to assist at the scene as well as an ambulance and first responders.

{¶11} Patrolman Mark and Patrolman Braden Wehrenberg proceeded to Appellant's residence at 673 Summit Street. The officers announced themselves and ordered Appellant to come to the door. Although Appellant spoke to the officers from inside the house, he initially refused to come to the door. When he finally appeared, Patrolman Mark instructed Appellant to put his hands behind his back, but Appellant shoved himself away. Patrolman Mark unsuccessfully tried to taser Appellant. Appellant

turned and ran back inside the house.  Lieutenant Akenra X and Patrolman Wehrenberg ultimately placed Appellant in handcuffs.

{¶12}  Patrolman Mark's body cam video was played for the jury.  Patrolman Mark described what is happening, noting another individual, Jason CoCo, had appeared. Appellant and CoCo showed Patrolman Mark the video recorded on CoCo's cell phone. Patrolman Mark testified what he observed on the cell phone video was a sexual assault. After speaking with Patrolman Mark, CoCo consented to the officer extracting the video from his phone.  The cell phone video was played for the jury.  Patrolman Mark detailed the incident captured on the video:

[Appellant's] right hand is on the neck of [the Victim] * * * that right arm is being used to press force on her neck into that couch.  And as you watch it, you can actually watch his muscle tone kind of change. Almost twist. * * *

Q. And there he's releasing her?

Yes.  * * * And you can hear her gasp for air.

* *

Q. Okay, And he has her throat – his hands around her throat again there; is that correct?

Correct.

* *

Q. Now, is he asking if she's not knowing what's going on there?

Yes.

* *

Q. And what is she saying there?

All right. I'm done.

Q. Does it end there, though?

No.

* *

* * * She's also, as you can hear, he restricts her airway so much to the point that she falls asleep and snores.

* *

At one point, you can hear her say, that I don't even know where I'm at right now.  Again, he uses almost the same position to – well, actually, use his arm – his right arm to come across – an elbow across her throat. And, obviously, you could hear her say no.  And almost push up off the couch in an attempt to get him off her.

* *

-- the right hand over [the Victim's] neck restricting her breathing again.  And then she states she want to leave.

*Id.* at 82-85.

{¶13} Officer Braden Wehrenberg with the Alliance Police Department testified he responded to a call on Summit Street during the early morning hours of August 14, 2021.

Patrolman Mark was already at the scene. Officer Wehrenberg spoke to Patrolman Mark and was advised an assault had occurred. The two officers proceeded across the street to 673 Summit Street in order to speak with Appellant. After placing Appellant in the back of a cruiser, Officer Wehrenberg went to Alliance Community Hospital to speak with the Victim.

{¶14} Officer Wehrenberg described the Victim as "[e]xtremely upset." *Id.* at 113. He observed the Victim's face was "[v]ery severely bruised" and "her eyes were almost swollen shut." *Id.* Officer Wehrenberg noted the Victim did not really understand what was going on and was very impaired. Although the Victim stated she had been assaulted, she did not make any claims of sexual assault. The Victim was "confident" she was not sexually assaulted and broke down again when Officer Wehrenberg informed her of the video. The Victim was transported to Aultman Hospital where she was examined by a Sexual Abuse Nurse Examiner ("SANE" nurse).

{¶15} Jason CoCo testified he was charged as a result of his involvement and pled guilty to pandering for video recording the sexual conduct between Appellant and the Victim. CoCo was transported from prison to testify at trial. CoCo stated he and Appellant have been friends for over twenty (20) years. CoCo and Appellant had been "out and about" that evening and returned to Appellant's house sometime after midnight. Tr. at 143. When they returned to Appellant's house, CoCo was playing games on his phone and Appellant was texting. CoCo added they "were getting high * * * "smoking meth." *Id.* at 145. The Victim arrived 15 to 20 minutes later. CoCo recalled the Victim brought two small bottles of vodka with her, but did not see the Victim drink any of the alcohol. CoCo described the Victim as "a little sloppy," noting "[h]er speech was a little

slurred." *Id*. at 147. CoCo did not know if the Victim was intoxicated or whether she had "a mental disorder." *Id*.

{¶16} During the course of the evening, Appellant asked CoCo to record the Victim and him having sex. CoCo complied with Appellant's request. He knew the Victim was under the influence, but, "wasn't in the right frame of mind that particular evening to pass judgment on anybody." *Id*. at 149. CoCo admitted it never occurred to him to stop recording although the Victim stated she did not know where she was and she wanted to leave. When asked if he observed Appellant strangle the Victim, CoCo responded, "I saw a simulation of strangulation. Yes * * * If I was to say that somebody was being choked, I would've seen both hands. [Appellant] didn't use both hands to try and choke her." *Id*. at 151-152. CoCo observed the Victim grasping for breath and trying to pull Appellant's forearm away. He denied seeing her passed out and snoring, but did see "a two to three second intermission where she wasn't verbal or made any sound." *Id*. at 152.

{¶17} After Appellant and the Victim "got done having sex," Appellant mentioned he and the Victim wanted to talk. *Id*. CoCo left the room for 20-25 minutes. When CoCo returned to the living room, Appellant and the Victim were still on the couch, talking. However, "they both got a little bit loud. And they both started, you know, shoving at each other. * * * I moved out of the way." *Id*. at 153. CoCo had no idea what had transpired, but "at some point [Appellant] was yelling [at the Victim] to get the fuck out of his house. And that's where she went." *Id*. at 154. The police arrived approximately ten minutes later. Upon Appellant's request, CoCo showed one of the officers the video he had recorded.

{¶18} On cross-examination, counsel for Appellant questioned CoCo about the Victim's active participation in the sexual activity. CoCo testified the Victim "[a]bsolutely" knew what she was doing. *Id.* at 162. CoCo could not recall hearing the Victim tell Appellant to stop or observe her trying to push Appellant away. CoCo believed the Victim was aware she was being recorded, but never asked him to stop recording. Appellant informed CoCo the Victim consented to having sex. CoCo heard Appellant tell the Victim he was going to "smack her ass," "smack her breasts," "smack her vaginal area," and "was going to choke her," and heard the Victim agree to it. *Id.* at 169.

{¶19} On re-direct, CoCo amended his responses on cross-examination and testified he did not recall Appellant asking the Victim for permission to smack her, but only recalled Appellant "saying that there was consent between the two of them and they wanted me to videotape it." *Id.* at 171. Sometime after August 14, 2022, Appellant spoke with CoCo and told him there was verbal consent. CoCo did not remember videotaping verbal consent between Appellant and the Victim. CoCo agreed he previously told the prosecutor he was "so high that night" he "really couldn't even come close to appreciating [the Victim's] state." *Id.* at 174.

{¶20} Heather Patterson, a registered nurse and a certified SANE nurse, testified she worked in the emergency department of Aultman Hospital and was on call on August 14, 2021, when she received a call advising her a patient was being transported from Alliance Community Hospital for a sexual assault examination. Patterson described the Victim as "very fearful, she was tearful, she was frustrated at times, because she had difficulty remembering the events that had occurred just within the last night that it happened." *Id.* at 186. Patterson identified the photographs she took of the Victim. The

photographs depicted the extent of the Victim's injuries including the bruising and swelling over both eyes, the discoloration between the Victim's nose and upper lip, and the bruising and discoloration around the Victim's neck. Patterson did not observe any external or internal vaginal injuries. Patterson explained it is not unusual not to find vaginal injuries even in a case of forcible rape. Although the Victim did not remember being strangled, the injuries to the Victim's neck were consistent with strangulation. Patterson provided the Victim with a strangulation protocol to educate her about the signs which would indicate her situation was worsening.

{¶21} After the state rested, Appellant made an oral Crim. R. 29 motion for acquittal, which the trial court denied. Thereafter, the defense presented its case-in-chief.

{¶22} Appellant testified in his own defense. Appellant stated he met the Victim approximately two weeks prior to the incident. During his initial conversation with the Victim, Appellant learned she was an alcoholic and she needed to have vodka to function. Appellant admitted he has been addicted to methamphetamine since 2017, and uses the drug on "almost a daily basis." *Id.* at 226. Appellant acknowledge he was convicted of domestic violence in 2008, and served a prison term followed by post-release control.

{¶23} Most of the interactions between Appellant and the Victim occurred at night. "She would come over to hang out, to drink, to get high. She always had – she smokes pot. And I would, too. But I usually had meth. And there was an occasion where she had – she would hit the meth once or twice. * * * And we would usually – almost every time ended up have sex for hours at a time." *Id.* at 227. Appellant recalled the Victim was never not intoxicated when they had sex.

**{¶24}** Appellant testified he and CoCo were at his house "almost the whole day," hanging out. *Id.* at 228. Appellant admitted he was getting high all day. Appellant and CoCo left for a period of time, but returned before evening. At some point, Appellant contacted the Victim. Appellant explained:

And I asked [CoCo] beforehand I – I contacted her for a very specific purpose. And that purpose wasn't able to be fulfilled, unless he was willing to go along with it. And so, I asked him first before I even messaged her. I said, I'm about to text [the Victim] and see if she'll come over here. And, you know, my – my terminology to see if she'll come over here and let me fuck her while you videotape. Would you be willing to do that if she's down to come over here? He said, sure, I'll do whatever you want.

*Id.* at 229.

**{¶25}** Appellant subsequently texted the Victim and she arrived approximately 15 minutes later. According to Appellant, the Victim "was no less intoxicated than – or no more intoxicated than any other night that I had ever seen her." *Id.* at 229 – 230. Appellant indicated the Victim, upon her arrival, announced she would not engage in a threesome, but was willing to have sex with Appellant while CoCo videotaped. Appellant did not observe the Victim drink any alcohol while she was at his house although she had bottles of vodka in her handbag. Appellant went upstairs to shower. The Victim was waiting for him in the spare bedroom. Appellant and the Victim started having sex, but moved to the living room in order for CoCo to videotape. Appellant explained, "Before we ever had sex

at all, one of the conversations I did have with her * * * We talked about what I was allowed to do with her during sex." *Id.* at 234. According to Appellant, the Victim consented to all of his requests to be rough. Appellant added he asked the Victim at certain points if she wanted him to stop.

{¶26} When Appellant and the Victim finished, the Victim tried to leave through the front door. Appellant prevented her from doing so because she did not have all of her clothes on. An argument ensued after Appellant accused the Victim of confusing him with her ex-boyfriend. Appellant remarked the Victim "just lost it. * * * grabbed me by my throat and spit in my face. * * * started swinging at me, screaming at me." *Id.* at 244. Appellant demanded she stop screaming or get out of his house. Approximately ten or fifteen minutes after the Victim left, the police arrived.

{¶27} On cross-examination, Appellant testified he observed the Victim smoked pot and hit the meth pipe while she was at his house. He did not see her drink any alcohol. Appellant admitted he slapped the Victim across the face four times, which caused the Victim's broken nose and black eyes.

{¶28} Upon conclusion of Appellant's re-direct examination, the defense rested its case.

{¶29} After hearing all the evidence and deliberating, the jury found Appellant guilty of Count 3, pandering sexually-oriented material involving a minor or impaired person, and Count 4, sexual battery. The jury found Appellant not guilty of Count 1, rape, and Count 2, felonious assault, but guilty of assault, the lesser included offense of felonious assault. The trial court sentenced Appellant to an aggregate term of incarceration of nine (9) years.

**{¶30}** It is from these convictions and sentence Appellant appeals, raising as his sole assignment of error:

THE DEFENDANT'S CONVICTION FOR PANDERING SEXUALLY-ORIENTED MATERIAL IN VIOLATION OF R.C. 2907.322 AND FOR SEXUAL BATTERY IN VIOLATION OF R.C. 2907.03 WERE AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE.

I

**{¶31}** In his sole assignment of error, Appellant challenges his convictions for pandering sexually-oriented material and sexual battery as against the manifest weight and sufficiency of the evidence.[1]

**{¶32}** In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts as a thirteenth juror and "in reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in evidence the jury 'clearly lost its wa8uc y and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Thompkins*, 78 Ohio St. 3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541, quoting *State v. Martin*, 20 Ohio App. 3d 172, 175, 485 N.E.2d 717 (1983).

---

[1] Appellant does not challenge his conviction for assault.

{¶33} An appellate court's function when reviewing the sufficiency of the evidence is to determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks,* 61 Ohio St. 3d 259, 574 N.E.2d 492, paragraph two of the syllabus (1991).

{¶34} Appellant was convicted of sexual battery, in violation of R.C. 2907.03(A)(2), which provides:

> No person shall engage in sexual conduct with another, not the spouse of the offender, when any of the following apply:
>
> * *
>
> (2) The offender knows that the other person's ability to appraise the nature of or control the other person's own conduct is substantially impaired.
>
> R.C. 2907.03(A)(2).

{¶35} Appellant asserts the state "was unable to meet their burden of showing [the Victim] was unable to appraise the nature of her own conduct by being substantial impaired." Brief of Appellant at p. 10.

{¶36} Because the phrase "substantially impaired" is not defined in the Ohio Criminal Code, the term "must be given the meaning generally understood in common usage." *State v. Zeh*, 31 Ohio St.3d 99, 103, 509 N.E.2d 414 (1987). In order to establish substantial impairment, the State must demonstrate "a present reduction, diminution or decrease in the victim's ability, either to appraise the nature of his conduct or to control

his conduct. This is distinguishable from a general deficit in ability to cope, which condition might be inferred from or evidenced by a general intelligence or I.Q. report." *Id.* at 103-104. "'Substantial impairment' need not be proven by expert medical testimony; it may be proven by the testimony of persons who have had some interaction with the victim and by permitting the trier of fact to obtain its own assessment of the victim's ability to either appraise or control her conduct." *State v. Hillock*, 7th Dist. Harrison No. 02-CA-538, 2002-Ohio-6897, ¶ 21 (Citation omitted).

**{¶37}** Voluntary intoxication is recognized as "a mental or physical condition that could cause substantial impairment." *State v. Hansing*, 9th Dist. Lorain No. 16CA011053, 2019-Ohio-739, ¶ 14. The fact of alcohol consumption on its own, however, does not necessarily evidence a "substantial impairment." *Id.* (Citations omitted). The offender must know or have reasonable cause to believe that the victim was impaired, rather than merely intoxicated. *Id.* (Citation omitted).

**{¶38}** At trial, the Victim testified she was not in control of her facilities, noting her speech was slurred and she tried to leave Appellant's home wearing only a t-shirt. R.M., the Victim's daughter, testified she had never seen her mother "this intoxicated before." Tr. at 35. Patrolman Sean Mark with the Alliance Police Department stated nothing about the Victim's appearance or behavior made him think she was functional. *Id.* at 104. Patrolman Mark noted the Victim was not able to speak in a coherent manner, her speech was slurred, and she reeked of alcohol. *Id.* at 104-105. R.M. told Patrolman Mark the Victim was "wasted." *Id.* at 105. CoCo testified the Victim was impaired, recalling she was intoxicated, sloppy, and slurring her speech. Tr. at 147, 149.

**{¶39}** The video taken by CoCo of Appellant and the Victim engaging in sexual activity demonstrates the Victim was impaired. The video depicts Appellant treating the Victim like a ragdoll. The Victim is unable to sit up or stand on her own. The Victim fell off the couch several times. When Appellant picked her up, the Victim was limp. At times, the Victim can be heard saying, "I don't know where I am," "I want to leave," "I can't breathe," and "No." The Victim was asleep at points during the video. Appellant struck her four times to wake her up.

**{¶40}** Appellant knew the Victim was an alcoholic and she appeared intoxicated when she arrived that evening. Appellant provided the Victim with pot and meth. When officers arrived, Appellant told them the Victim was impaired, intoxicated, and a psycho.

**{¶41}** Appellant was also convicted of pandering sexually-oriented matter involving a minor or impaired person, in violation of R.C. 2907.322(A)(1), which provides:

No person, with knowledge of the character of the material or performance involved, shall do any of the following:

Create, record, photograph, film, develop, reproduce, or publish any material that shows a minor or impaired person participating or engaging in sexual activity, masturbation, or bestiality.

R.C. 2907.322(A)(1).

**{¶42}** Appellant maintains the state failed to establish the Victim was too impaired to consent to the recording of the sexual activity. Appellant submits "simply videoing

consensual sexual activity is not the type of conduct that is criminalized by [R.C. 2907.322(A)(1)]." Brief of Appellant at 12.

**{¶43}** At trial, Appellant acknowledged he planned to have CoCo record him and the Victim having sex. Once CoCo agreed to record the sexual activity, Appellant texted the Victim and asked her to come over to his house to hang out. The Victim only recalled arriving at Appellant's house, sitting down, then waking up to Appellant hitting her. She did not remember anything else that happened that evening. Further, the contents of the video, as discussed, supra, unquestionably reveal the Victim was substantially impaired throughout the course of the evening.

**{¶44}** The jury was free to accept or reject any and all of the evidence offered by the parties and assess the credibility of the witnesses. "While the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render [a] defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. McGregor,* 5th Dist. Ashland No. 15–COA–023, 2016–Ohio–3082, 2016 WL 2942992, ¶ 10, citing *State v. Craig,* 10th Dist. Franklin No. 99AP–739, 2000 WL 297252 (Mar. 23, 2000). Indeed, the jurors need not believe all of a witness' testimony, but may accept only portions of it as true. *Id.* The jury clearly believed the testimony and video establishing the Victim was substantially impaired.

{¶45} Based upon the foregoing and the entire record in this matter, we find Appellant's convictions were not against the manifest weight of the evidence and were based upon sufficient evidence.

{¶46} The judgment of the Stark County Court of Common Pleas is affirmed.

By: Hoffman, P.J.

Delaney, J. and

Baldwin, J. concur