[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Jordan*, Slip Opinion No. 2023-Ohio-3800.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2023-OHIO-3800

THE STATE OF OHIO, APPELLANT, *v.* JORDAN, APPELLEE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Jordan*, Slip Opinion No. 2023-Ohio-3800.]

*Criminal law—Sufficiency of the evidence—R.C. 2907.06(A)(2)—Substantial impairment—Blindness—Court of appeals' judgment reversed and trial court's judgment reinstated.*

(No. 2022-0736—Submitted May 3, 2023—Decided October 24, 2023.)

APPEAL from the Court of Appeals for Hamilton County,

Nos. C-210198 and C-210199, 2022-Ohio-1512.

_____

**KENNEDY, C.J., announcing the judgment of the court.**

{¶ 1} In this discretionary appeal from a judgment of the First District Court of Appeals, we consider whether a jury can reasonably infer that a defendant knew a victim to be substantially impaired so as to convict him of sexual imposition under R.C. 2907.06(A)(2). We conclude that a jury may make such an inference, and we therefore reverse the judgment of the First District.

## I. Facts and Procedural Background

{¶ 2} For almost 13 months, appellee, Joel Jordan, was the night supervisor of the Samuel Bell Home for the Sightless ("Bell House"), a residential facility in Hamilton County for legally blind individuals. Although its residents live independently, Bell House provides several benefits, including meals and night supervision. As night supervisor, Jordan worked from 6 p.m. to 6 a.m., seven days a week. He was responsible for helping residents in emergencies and served evening coffee and weekend lunch and dinner. As part of his compensation, Jordan was provided an efficiency apartment at Bell House.

{¶ 3} During Jordan's employment, S.W. was a Bell House resident. As Bell House night supervisor, Jordan interacted with S.W. during evening coffee services and weekend lunch and dinner services. In March 2019, S.W. had been a Bell House resident for almost four years. S.W. has no vision in her left eye and limited vision in her right eye. S.W. also suffers from unspecified developmental disabilities.

{¶ 4} On March 6, 2019, S.W. called her parents and described certain sexual contact that Jordan had recently subjected her to. Law enforcement investigated, and Jordan was charged with two third-degree-misdemeanor counts of sexual imposition. Count 1 charged a violation of R.C. 2907.06(A)(2), which proscribes sexual contact with another person when the "offender knows" that the other person's "ability to appraise the nature of or control the offender's or touching person's conduct is substantially impaired." Count 2 charged a violation of R.C. 2907.06(A)(1), which proscribes sexual contact with another person when the offender knows that the contact "is offensive to the other person." Jordan pleaded not guilty.

### A. The Trial

{¶ 5} At trial, the jury heard testimony from several witnesses, including S.W. and Jordan, and watched surveillance footage of some of the interactions

between them.  Based on a psychologist's report, the state and Jordan stipulated at trial that S.W. lacked the capacity to consent to sexual activity.

{¶ 6} S.W. testified as follows.  On March 6, 2019, S.W. engaged in a conversation with Jordan during evening coffee service.  Jordan commented on S.W.'s low weight and offered to weigh and measure her.  At Jordan's request, S.W. left to find a tape measure.  S.W. could not find a tape measure, so she headed to the fitness room to weigh herself.  Jordan intercepted S.W. and told her to come to his apartment so he could measure her there.

{¶ 7} In the apartment, Jordan tried to find a tag inside S.W.'s pants.  Professing an inability to read the tag, Jordan asked S.W. to take off her pants.  S.W. undressed.  Jordan squeezed S.W.'s breast, telling her that he was getting her cup size.  S.W. became very uncomfortable.  Jordan then asked S.W. about masturbation, and he touched her genitals with his hand.  S.W. told Jordan she did not like what he was doing, and she slapped his hand away.  Jordan then told S.W. that she needed to be more comfortable around men and asked her whether she had ever seen a penis.  She said no, and Jordan let her touch his penis.  S.W. felt "awkward and uncomfortable."  S.W. told Jordan she had to go, and she quickly dressed.  As she left, Jordan told S.W., "It's our little secret."  S.W. immediately called her parents to ask whether she had suffered a sexual assault.

{¶ 8} In his testimony, Jordan denied having had any sexual contact with S.W.  The jury also heard from the investigating officer, who testified that Jordan had told him that S.W. had poor hygiene: "[I]t was not uncommon for her not to bathe."  According to the officer, Jordan believed S.W. to have defecated in her clothes.

{¶ 9} The jury found Jordan guilty of both counts of sexual imposition.  The trial court merged the counts, sentencing Jordan only on Count 1.

### B. The Court of Appeals

{¶ 10} Jordan appealed to the First District, challenging the sufficiency of the evidence presented at trial. 2022-Ohio-1512. Jordan argued that the state had presented insufficient evidence to prove that he knew S.W. to be substantially impaired. *Id.* at ¶ 20. The First District agreed, concluding that the testimony from S.W. and Jordan "established that their interactions were limited to [Jordan's] serving [S.W.] coffee and sandwiches during his night and weekend shifts." *Id.* The court reasoned that because Bell House was an independent-living facility and not a medical-care facility, assisted-living facility, or nursing home, there "was nothing in the record to suggest that Jordan's interactions with S.W. demonstrated knowledge of a substantial impairment." *Id.* The court also considered the investigating officer's testimony but determined that "without more," the testimony failed to prove that Jordan knew S.W. to be substantially impaired. *Id.* at ¶ 21.

{¶ 11} The court of appeals also analyzed whether S.W.'s visual impairment rendered her substantially impaired, such that Jordan's knowledge of S.W.'s blindness satisfied the knowledge element of R.C. 2907.06 (A)(2). *Id.* at ¶ 24-26. Without addressing Jordan's knowledge, the court held that S.W. was not substantially impaired by her blindness because "generally, individuals with visual impairments are able to consent to sexual activity," and there was nothing in the record "suggesting a causal nexus between S.W.'s reduced vision and her inability to control or appraise the nature of Jordan's conduct." *Id.* at ¶ 24. The First District consequently reversed Jordan's conviction for violating R.C. 2907.06(A)(2), dismissed the appeal as it related to Count 2 for lack of a final, appealable order, and remanded for sentencing and entry of a final order regarding his conviction under R.C. 2907.06(A)(1). *Id.* at ¶ 28.

{¶ 12} We accepted the state's appeal on the following proposition of law:

> The element of "significant impairment" to support a conviction for sexual imposition under R.C. 2907.06(A)(2) includes the defendant's knowledge the victim is blind. Blindness can limit a person's ability to defend against a sexual assault, particularly under circumstances where it is uncontested the blind victim *lacks the capacity to consent to sexual activity*.

(Emphasis added.) *See* 167 Ohio St.3d 1517, 2022-Ohio-3214, 195 N.E.3d 142. We reverse the judgment of the First District and reinstate the judgment of the trial court.

## II. Law and Analysis

### A. Standard of Review

{¶ 13} On appeal below, Jordan challenged the sufficiency of the evidence presented at trial. Whether a conviction is supported by sufficient evidence is a question of law that this court reviews de novo. *State v. Groce*, 163 Ohio St.3d 387, 2020-Ohio-6671, 170 N.E.3d 813, ¶ 7.

### B. Sufficiency of the Evidence and Manifest Weight of the Evidence

{¶ 14} Before we consider the proposition of law before us, we must address the appellate court's improper use of the manifest-weight-of-the-evidence standard to resolve a sufficiency-of-the-evidence challenge. In reviewing the sufficiency challenge, the court of appeals held that the evidence of S.W.'s blindness was insufficient to support Jordan's conviction because blindness does not necessarily substantially impair an individual's ability to appraise the nature of or control another person's conduct. 2022-Ohio-1512 at ¶ 24.

{¶ 15} The court of appeals was asked to review the sufficiency of the evidence presented at trial to prove that Jordan knew S.W. to be substantially impaired. *Id.* at ¶ 11. Instead, the court engaged in a manifest-weight-of-the-evidence analysis. *See generally id.* Challenges to the sufficiency of the evidence

and the weight of the evidence involve distinct legal concepts and different standards of review. *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), paragraph two of the syllabus. While both challenge the strength of the evidence, "[a] challenge to the sufficiency of the evidence attacks its adequacy * * * while a challenge to the weight of the evidence attacks its persuasiveness * * *." *Disciplinary Counsel v. Smith*¸152 Ohio St.3d 337, 2017-Ohio-9087, 96 N.E.3d 234, ¶ 23.

{¶ 16} When reviewing a challenge to the sufficiency of the evidence, the evidence is viewed in a light most favorable to the prosecution, and the relevant inquiry is whether " 'any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.' " *State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 150, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102, 684 N.E.2d 668 (1997), fn. 4. "[A]n appellate court does not ask whether the evidence should be believed but, rather, whether the evidence, 'if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.' " *State v. Pountney*, 152 Ohio St.3d 474, 2018-Ohio-22, 97 N.E.3d 478, ¶ 19, quoting *Jenks* at paragraph two of the syllabus. A verdict should not be disturbed on appeal unless reasonable minds could not reach the trier of fact's conclusion. *See State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, ¶ 74. To reverse a trial court's judgment on the basis that there was insufficient evidence to support a conviction, "a concurring majority of a panel of a court of appeals" is necessary. *Thompkins* at 389.

{¶ 17} In contrast, when an appellate court reviews whether a judgment is against the manifest weight of the evidence, the court looks at the entire record and " 'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury

clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered.' " *Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Sitting as the "thirteenth juror," the court of appeals considers whether the evidence should be believed and may overturn a verdict if it disagrees with the trier of fact's conclusion. *See id.* To reverse a trial court's judgment pursuant to a manifest-weight-of-the-evidence challenge, all three judges on the court-of-appeals panel must concur. Ohio Constitution, Article IV, Section 3(B)(3).

{¶ 18} Here, the court of appeals applied the manifest-weight-of-the-evidence standard to a sufficiency-of-the-evidence challenge by weighing the credibility of the evidence. For example, the court of appeals described the number and nature of interactions between S.W. and Jordan as "limited," 2022-Ohio-1512 at ¶ 20, even though the trial record never characterized the interactions in such terms. Similarly, the court acknowledged the existence of lay-witness testimony regarding Jordan's perception of S.W. but found that "without more," the testimony failed to establish that Jordan knew S.W. to be substantially impaired. The court also weighed the evidence when it determined that Bell House's status as an independent-living facility showed that there "was nothing in the record to suggest that Jordan's interactions with S.W. demonstrated knowledge of a substantial impairment," *id.* Effectively, the court of appeals weighed whether the testimony should be believed, not whether, if believed, it could convince an average mind beyond a reasonable doubt. Additionally, even if applying the manifest-weight-of-the-evidence standard were proper, there was not a unanimous concurrence of the three judges on the court-of-appeals panel as required to reverse a trial-court judgment pursuant to a manifest-weight-of-the-evidence challenge. *See id.* at ¶ 41 (Winkler, J., dissenting).

### C. Substantially Impaired

{¶ 19} In addition to finding that the state failed to prove by sufficient evidence that Jordan knew S.W. to be substantially impaired, the First District also held that blind people are not inherently substantially impaired under R.C. 2907.06(A)(2). Whether blindness substantially impairs a person contributes to our analysis of whether Jordan knew S.W. to be substantially impaired, so we resolve this question of statutory interpretation first.

{¶ 20} Statutory interpretation is a question of law, which we review de novo. *State v. Straley*, 139 Ohio St.3d 339, 2014-Ohio-2139, 11 N.E.3d 1175, ¶ 9. "[W]here the language of a statute is clear and unambiguous, it is the duty of the court to enforce the statute as written, making neither additions to the statute nor subtractions therefrom." *Hubbard v. Canton City School Bd. of Edn.*, 97 Ohio St.3d 451, 2002-Ohio-6718, 780 N.E.2d 543, ¶ 14. But if the statute is ambiguous, "we must then interpret the statute to determine the General Assembly's intent." *State v. Hairston*, 101 Ohio St.3d 308, 2004-Ohio-969, 804 N.E.2d 471, ¶ 13.

{¶ 21} In part, resolution of the question before us turns on the meaning of the term "substantially impaired" in R.C. 2907.06(A)(2). When statutory terms are undefined, we "afford the terms their plain, everyday meanings, looking to how such words are ordinarily used." *State ex rel. MORE Bratenahl v. Bratenahl*, 157 Ohio St.3d 309, 2019-Ohio-3233, 136 N.E.3d 447, ¶ 12.

{¶ 22} "Substantially" has been defined as "in a substantial manner" or "so as to be substantial." *Webster's Third New International Dictionary* 2280 (2002). To better understand these definitions, we examine the word "substantial," which means "constituting substance" or "not seeming or imaginary." *Id*. "Impaired" means "to make worse" or "diminish in quantity, value, excellence, or strength" *Id*. at 1131.

{¶ 23} Based on the plain meaning of the words, blindness substantially impairs a person because blindness is a substantive, nonimaginary diminution in

the excellence or strength of a person's vision. The court of appeals is correct that absent an intellectual disability, blindness does not decrease an individual's ability to appraise the nature of another's conduct. However, blindness does lessen a person's ability to control another's conduct. In the context of R.C. 2907.06(A)(2), blindness diminishes the blind person's ability to defend against unwanted sexual contact by another, because the blind person cannot see the impending unwanted sexual contact.

{¶ 24} We do not conclude that nonspousal sexual contact with a blind person is a per se violation of R.C. 2907.06(A)(2). We agree with the court of appeals that blind people can consent to sexual contact. However, when a blind person lacks the capacity to consent or does not give consent, either express or implied, then the offender may be charged pursuant to R.C. 2907.06(A)(2) because the victim is substantially impaired by his or her blindness. Whether sexual contact with a blind person violates R.C. 2907.06(A)(2) must be determined on a case-by-case basis. Here, S.W.'s blindness, coupled with her inability to consent to sexual activity, certainly made her substantially impaired in appraising the nature of or controlling Jordan's conduct.

### D. Jury Inference of Jordan's Knowledge

{¶ 25} Turning to the proposition of law that we accepted for review and applying the proper legal standard, we find that there was sufficient evidence to convince a rational trier of fact, beyond a reasonable doubt, that Jordan knew S.W. to be substantially impaired, because a rational trier of fact could properly infer Jordan's knowledge through the evidence presented.

{¶ 26} R.C. 2907.06(A)(2) applies only when an offender knows that the victim is substantially impaired. "When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact."

9

R.C. 2901.22(B). In many circumstances, proving knowledge beyond a reasonable doubt can be difficult. *Flores-Figueroa v. United States*, 556 U.S. 646, 655, 129 S.Ct. 1886, 173 L.Ed.2d 853 (2009). Therefore, the state can prove knowledge through either direct or circumstantial evidence. *See McFadden v. United States*, 576 U.S. 186, 192, 135 S.Ct. 2298, 192 L.Ed.2d 260 (2015), fn. 1. Because the trier of fact "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of proffered testimony," a jury may rely on circumstantial evidence to reasonably infer an offender's knowledge. *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984); *see generally Rehaif v. United States*, 588 U.S. __, __, 139 S.Ct. 2191, 2198, 204 L.Ed.2d 594 (2019).

{¶ 27} Jordan knew that S.W. was blind. For almost 13 months, Jordan worked 12 hours a day, 7 days a week, as night supervisor of Bell House, where residents must be legally blind as defined by the Internal Revenue Service. S.W. had been a resident of Bell House for almost four years.

{¶ 28} Furthermore, the jury was presented with sufficient circumstantial evidence to rationally conclude that Jordan knew S.W. to be developmentally disabled. At trial, the investigating officer testified that Jordan told him that S.W. had poor hygiene, and Jordan believed that S.W. had defecated in her clothes. S.W.'s testimony revealed that Jordan treated S.W. as if she were developmentally disabled, requesting that she remove her pants so that he could read the tag inside, introducing sexual contact gradually, and telling her that she needed to be more comfortable around men. And S.W. believed that Jordan was trying to measure her when he told her to remove her pants and then squeezed her breast, purportedly to determine her cup size. Jordan suggested that this sexual contact should be their "little secret" as if he were instructing a child. After viewing the evidence in a light most favorable to the prosecution, therefore, we conclude that the record contains sufficient circumstantial evidence that, if believed, would convince a rational trier

of fact, beyond a reasonable doubt, that Jordan knew S.W. to be substantially impaired.

### III. Conclusion

{¶ 29} We agree with the state and conclude that knowledge of a victim's "substantial impairment" under R.C. 2907.06(A)(2) can be proved both by the defendant's knowledge of the victim's blindness and evidence of the nature of the interactions between the defendant and the developmentally disabled victim. Here, the evidence before the jury was sufficient for it to find that Jordan knew that S.W.'s blindness, coupled with her developmental disabilities, substantially impaired her ability to appraise the nature of and control his conduct.

{¶ 30} We reverse the judgment of the First District Court of Appeals and reinstate Jordan's conviction for violating R.C. 2907.06(A)(2).

Judgment reversed.

DEWINE and EPLEY, JJ., concur.

FISCHER, J., concurs in judgment only.

STEWART, J., dissents, with an opinion joined by DONNELLY, J., and joined in part by BRUNNER, J., in that she would dismiss the cause as having been improvidently accepted.

CHRIS EPLEY, J., of the Second District Court of Appeals, sitting for DETERS, J.

_____

**STEWART, J., dissenting.**

{¶ 31} The lead opinion begins by stating that in this appeal, "we consider whether a jury can reasonably infer that a defendant knew a victim to be substantially impaired so as to convict him of sexual imposition under R.C. 2907.06(A)(2)." Lead opinion, ¶ 1. What the justices joining the lead opinion consider, however, is not the question that the state presented to us on appeal or that this court accepted for review, *see* 167 Ohio St.3d 1517, 2022-Ohio-3214, 195 N.E.3d 142. The state's proposition

of law is:

> The element of "significant impairment" to support a conviction for sexual imposition under R.C. 2907.06(A)(2) includes the defendant's knowledge the victim is blind. Blindness can limit a person's ability to defend against a sexual assault, particularly under circumstances where it is uncontested the blind victim lacks the capacity to consent to sexual activity.

{¶ 32} In other words, the proposition of law that this court accepted for review concerns whether appellee Joel Jordan's knowledge of S.W.'s blindness was sufficient evidence to prove that he knew that her ability to appraise the nature of or control his conduct was substantially impaired. *See* R.C. 2907.06(A)(2). Even if the state's proposition of law were a correct (albeit very general) statement of the law, that would not change the First District Court of Appeals' decision in this case, because it was not based solely on S.W.'s visual impairment.

{¶ 33} The court of appeals held, "We cannot find, and the state does not cite to anything in the record, suggesting a causal nexus between S.W.'s reduced vision and her inability to control or appraise the nature of Jordan's conduct." 2022-Ohio-1512, ¶ 24. The court also concluded that "there is nothing in S.W.'s testimony or her demeanor in the surveillance footage to suggest that her unspecified cognitive limitation was readily discernible." *Id.* at ¶ 23. The state's proposition of law here addresses only the conclusion by the court of appeals regarding S.W.'s visual impairment; it does not challenge the court of appeals' conclusion regarding S.W.'s cognitive limitation.[1] If the state's proposition of law

---

1. Perhaps recognizing the limited scope of its proposition of law, the state attempted to present this court with a revised proposition in its original merit brief, which stated:

does not fit the evidence that the prosecution presented during trial, this court cannot assume the role of the prosecution to craft a more suitable proposition. For this reason, I would affirm the judgment of the First District or dismiss this appeal as having been improvidently accepted.[2]

{¶ 34} Interestingly, the lead opinion appears to agree with the court of appeals' conclusion on the question that the state actually presented here, because the lead opinion does not find in the record any causal nexus between S.W.'s visual impairment and her ability to appraise the nature of or control Jordan's conduct,

---

> The element that defendant had the requisite knowledge the victim suffered from a substantial impairment to support a criminal conviction for sexual imposition under R.C. 2907.06(A)(2) is supported by evidence that the victim: (1) is legally blind; (2) lacks the capacity to consent to sexual activity; and, (3) has daily interaction with defendant where he had ample opportunity to know the victim's physical and cognitive deficiencies that constitute her substantial impairment, which made her particularly vulnerable to defendant's unwanted sexual advances.

The day after the state filed its merit brief, Jordan moved to dismiss the appeal or for this court to strike the state's brief, arguing that the state had "addressed a proposition of law in its merit brief that was not raised in its jurisdictional memorandum." The state filed an amended merit brief, changing the proposition of law to the one this court accepted for review. We subsequently denied Jordan's motion as moot. 169 Ohio St.3d 1419, 2023-Ohio-152, 201 N.E.3d 898.

2. Jordan was found guilty of two counts of sexual imposition: one count under R.C. 2907.06(A)(1) (prohibiting sexual contact with another when "[t]he offender knows that the sexual contact is offensive to the other person * * * or is reckless in that regard") and one count under R.C. 2907.06(A)(2) (prohibiting sexual contact with another when "[t]he offender knows that the other person's * * * ability to appraise the nature of or control the offender's * * * conduct is substantially impaired"), both of which are third-degree misdemeanors and are sexually oriented offenses for purposes of sex-offender classification under R.C. 2950.01. The trial court merged the counts for sentencing purposes and sentenced Jordan for his violation of R.C. 2907.06(A)(2).

The First District did not address Jordan's challenge to his conviction under R.C. 2907.06(A)(1), concluding that it lacked jurisdiction to do so because the trial court had not imposed a sentence for that count and thus there was no final, appealable order on that count. 2022-Ohio-151 at ¶ 28. As a result, the court of appeals remanded the case for sentencing on the count. That portion of the First District's decision has not been appealed. Thus, a decision by this court to affirm the judgment of the court of appeals or to dismiss this case as having been improvidently accepted would result in the case being remanded to the trial court for Jordan to be sentenced for violating R.C. 2907.06(A)(1).

*see* R.C. 2907.06(A)(2). In that regard, the lead opinion simply states that "Jordan knew that S.W. was blind" because S.W. had been a resident of Bell House, "where residents must be legally blind as defined by the Internal Revenue Service." Lead opinion at ¶ 27. Nonetheless, while claiming to recognize that a person's being visually impaired does not in and of itself equate to the person's being substantially impaired for purposes of R.C. 2907.06(A)(2), the lead opinion takes a misguided journey to reverse the court of appeals' decision on other grounds.

{¶ 35} To reach the outcome it desires, the justices joining the lead opinion conduct an irrelevant statutory-interpretation analysis about whether "blindness" amounts to "substantial impairment," even though neither party has suggested that such an inquiry is necessary and that analysis creates more questions than it resolves. The lead opinion concludes, "*Based on the plain meaning of the words* ['substantially,' 'substantial,' and 'impaired'], blindness substantially impairs a person because blindness is a substantive, nonimaginary diminution in the excellence or strength of a person's vision." (Emphasis added.) Lead opinion at ¶ 23. It continues, "In the context of R.C. 2907.06(A)(2), *blindness diminishes the blind person's ability to defend against unwanted sexual contact by another, because the blind person cannot see the impending unwanted sexual contact.*" (Emphasis added.) *Id.* at ¶ 23.

{¶ 36} In these unnecessary conclusions, the lead opinion takes some strange missteps. First, it lumps all visual impairments under one term: "blindness." S.W. is "legally blind" as that term is defined by the Internal Revenue Service, *id.* at ¶ 27, but S.W. agreed in her testimony that she "can * * * see a few things" and that her vision in one eye allows her to see approximately six to ten feet in front of her. Given that S.W. has some vision, it is unclear whether her visual impairment would fall under the lead opinion's definition of "blindness" and amount to "substantial impairment" as a matter of law in its view. Indeed, the lead opinion's attempt to equate "blindness" with "substantial impairment" leads to a

14

host of additional questions. If blindness substantially impairs someone because it is a "substantive, nonimaginary diminution in the excellence or strength of a person's vision," *id.* at ¶ 23, as the lead opinion concludes, is any level of vision-quality diminution enough to render a person substantially impaired? Does the use of corrective lenses render someone less blind or not "legally blind"? How much "excellence" of vision must be maintained or otherwise restored by corrective lenses such that the person is not substantially impaired? What if it is nighttime or the lights are out, resulting in a diminution in the excellence or strength of a person's vision? Does this amount to substantial impairment warranting a substantial-impairment instruction to the fact-finder? I offer these questions not as inquiries for this appeal but to demonstrate the lack of usefulness of, and clarity in, the lead opinion's analysis.

{¶ 37} Second, the lead opinion would create a strict-liability category for a violation of R.C. 2907.06(A)(2) when it states, "In the context of R.C. 2907.06(A)(2), blindness diminishes the blind person's ability to defend against unwanted sexual contact by another, because the blind person cannot see the impending unwanted sexual contact," lead opinion at ¶ 23. There are several problems with that statement. One, there is no "context" with respect to R.C. 2907.06(A)(2) except what the facts of any given case might show. And two, the context of this case is that the state presented no evidence by which a fact-finder could conclude or even infer that S.W.'s visual impairment made her unable to see or perceive any aspect of Jordan's conduct. In fact, quite the opposite may be true, given that S.W. testified that she could see six to ten feet in front of her. Also, no evidence was presented showing that Jordan had tried to use S.W.'s visual impairment to catch her by surprise so that she could not defend against any impending, unwanted sexual contact. Instead, the evidence shows that Jordan used the ruse of being concerned about S.W.'s weight to manufacture the encounter. Jordan asked S.W. to allow him to measure her and suggested that she come into

his room. He asked S.W. to take off her clothing. Jordan then sat her down and touched her breast. S.W. testified about what Jordan said to her and the things she did at his request or instruction throughout the rest of the encounter. She slapped Jordan's hand away when he was touching her vagina. And she testified that she left Jordan's room when she decided to do so and that she was able to navigate from his room to hers. Even under the lead opinion's contention that "blindness diminishes the blind person's ability to defend against unwanted sexual contact by another, because the blind person cannot see the impending unwanted sexual contact," lead opinion at ¶ 23, the record contains no direct evidence from which to conclude, nor any circumstantial evidence from which to infer, that S.W.'s blindness rendered her substantially impaired such that she could not defend herself against any "impending unwanted sexual contact," *id.*

{¶ 38} None of this is to suggest that S.W. consented to the encounter or the sexual contact. Rather, the evidence illustrates that S.W.'s visual impairment did not render her substantially impaired such that she was unable to appraise the nature of or control Jordan's conduct. Thus, even under the lead opinion's conclusion that "blindness" equates with "substantial impairment" for the purpose of finding a violation of R.C. 2907.06(A)(2), the facts of this case do not fit that definition.

{¶ 39} So what *did* the state establish at trial regarding the significance of the evidence of S.W.'s visual impairment on the question whether Jordan knew that she was unable to appraise the nature of or control his conduct? Very little. The lead opinion submits only that Jordan must have known S.W. was legally blind because he worked at Bell House, where residents such as S.W. must be legally blind to live there. But the lead opinion does not let this lack of evidence get in its way. Instead, it would create a new category of offense under R.C. 2907.06(A)(2) for "nonspousal sexual contact with a blind person," lead opinion at ¶ 24, despite insisting that it is not doing so. The lead opinion concludes that "when a blind person lacks the capacity to consent or does not give consent, either express or

implied, then the offender may be charged pursuant to R.C. 2907.06(A)(2) because the victim is substantially impaired by his or her blindness." *Id.* at ¶ 24. Despite the lead opinion's assurance that each R.C. 2907.06(A)(2) case involving sexual contact with a blind person must be determined on a case-by-case basis, there is no other way to interpret the above-quoted sentence except to conclude that it would improperly create a strict-liability violation under R.C. 2907.06(A)(2) when the victim of nonspousal, nonconsensual sexual contact suffers from any amount of vision loss that renders the person legally blind.

{¶ 40} Importantly, the operative question when determining whether a violation of R.C. 2907.06(A)(2) has occurred, which the lead opinion has ignored, is not whether the alleged victim was substantially impaired, however such impairment might be defined. Rather, the question is whether the defendant knew that the person's "ability to appraise the nature of or control the offender's or touching person's conduct [was] substantially impaired," *id.* Thus, the statute requires a connection between the impairment and the impaired person's ability to appraise the nature of or control the offender's conduct *under the particular circumstances of the case*. And that connection must be proved by the state. *See State v. Siple*, 5th Dist. Stark No. 2022CA00092, 2023-Ohio-1980, ¶ 36, quoting *State v. Zeh*, 31 Ohio St.3d 99, 103-104, 509 N.E.2d 414 (1987) ("In order to establish substantial impairment, *the State must demonstrate* 'a present reduction, diminution or decrease in the victim's ability, either to appraise the nature of [the offender's] conduct or to control [the offender's] conduct. This is distinguishable from a general deficit in ability to cope, which condition might be inferred from or evidenced by a general intelligence or I.Q. report' " [emphasis added]).

{¶ 41} Consider the significant body of caselaw involving whether a victim's voluntary intoxication is "substantial impairment" for the purposes of establishing that element of a rape offense under R.C. 2907.02(A)(1)(c) (requiring that "the offender knows or has reasonable cause to believe that the other person's

ability to resist or consent is substantially impaired because of a mental or physical condition"). The victim's intoxication, alone, is not necessarily "substantial impairment." *State v. Hansing*, 2019-Ohio-739, 132 N.E.3d 252, ¶ 14 (9th Dist.) ("we cannot say that every instance of intoxication equates with substantial impairment"). And even if it is proved that the person's level of intoxication amounted to substantial impairment, that does not end the relevant inquiry, because the state must also produce legally sufficient evidence that the offender knew of the substantial impairment, not just that the victim was intoxicated. *See, e.g.*, *State v. Foster*, 2020-Ohio-1379, 153 N.E.3d 728, ¶ 46-58 (8th Dist.) (finding that there may have been sufficient evidence that the victim was substantially impaired due to intoxication at the time of the sexual conduct but that there was insufficient evidence that the defendant had been aware or had cause to believe the victim was substantially impaired).

{¶ 42} Here, in comparison, even if we were to assume that there was sufficient evidence presented that S.W.'s visual impairment constituted substantial impairment, the evidence shows that S.W. was able to interact with Jordan in a way that indicates she was able to appraise the nature of his conduct. She was able to voice her objection, which she did, and she even slapped Jordan's hand away at one point. She was also able to leave his room on her own. Even considering the evidence in a light most favorable to the state, as we must for sufficiency-of-the-evidence review, *see State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102, 684 N.E.2d 668 (1997), fn. 4, the evidence that the state presented in this case would not convince the average juror beyond a reasonable doubt that Jordan knew that S.W.'s blindness substantially impaired her ability to appraise the nature of or control his conduct, *see id.* at 273.

{¶ 43} In attempting to craft a better argument for the state, the lead opinion

distorts the law and creates confusion. It concludes that the state presented "sufficient circumstantial evidence to rationally conclude that Jordan knew S.W. to be *developmentally disabled*." (Emphasis added.) Lead opinion at ¶ 28. But in this appeal, the state asks us to weigh in on only the significance of the evidence of the victim's *blindness* in considering Jordan's actions. Because the lead opinion's conclusion is based on an issue this court did not accept for review and because the state's actual proposition of law is not a basis to reverse the court of appeals' decision, I would either affirm the judgment of the First District Court of Appeals or dismiss this case as having been improvidently accepted. I therefore dissent.

DONNELLY, J., concurs in the foregoing opinion.

BRUNNER, J., concurs in part in the foregoing opinion in that she would dismiss the cause as having been improvidently accepted.

_____

Melissa A. Powers, Hamilton County Prosecuting Attorney, and Ronald W. Springman, Assistant Prosecuting Attorney, for appellant.

Raymond T. Faller, Hamilton County Public Defender, and Sarah E. Nelson, Assistant Public Defender, for appellee.

_____