[Cite as *State v. Williams*, 2024-Ohio-5578.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
|---|---|---|
| STATE OF OHIO | : | Hon. W. Scott Gwin, P.J. |
|  | : | Hon. John W. Wise, J. |
| Plaintiff-Appellee | : | Hon. Andrew J King, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 2024 CA 00009 |
| DEVION LAMAR WILLIAMS | : |  |
|  | : |  |
| Defendant-Appellant | : | OPINION |

CHARACTER OF PROCEEDING:      Appeal from the Stark County Court of Common Pleas, Case No. 2023 CR 0984

JUDGMENT:      Affirmed in part; reversed in part and remanded

DATE OF JUDGMENT ENTRY:      November 25, 2024

APPEARANCES:

For Plaintiff-Appellee

KYLE STONE
Stark County Prosecutor
BY: VICKI L. DESANTIS
Assistant Prosecutor
110 Central Plaza South, Ste. 510
Canton, OH 44702-1413

For Defendant-Appellant

D. COLEMAN BOND
116 Cleveland Avenue N.W.
Canton, OH 44702

*Gwin, P.J.*

{¶1} Defendant-appellant Devion Lamar Williams ["Williams"] appeals his convictions and sentences after a jury trial in the Stark County Court of Common Pleas.

*Facts and Procedural History*

{¶2} On May 24, 2023, the Stark County Grand Jury returned a seventeen count indictment against Williams, charging him with, Count One: Attempted Murder, R.C. 2903.02(A), a felony of the first degree; Count Two: Aggravated Burglary, R.C. 2911.11(A)(1), a felony of the first degree; Count Three: Rape, R.C. 2907.02(A)(2), a felony of the first degree; Count Four: Kidnapping, R.C. 2905.01(A)(4), a felony of the first degree along with an accompanying sexual motivation specification under R.C. 2941.147(A); Count Five: Aggravated Burglary, R.C. 2911.11(A)(1), a felony of the first degree; Count Six: Kidnapping, R.C. 2905.01(A)(3), a felony of the first degree; Count Seven: Kidnapping, R.C. 2905.01(A)(1), a felony of the first degree; Count Eight: Felonious Assault, R.C. 2903.11(A)(1), a felony of the second degree; Count Nine: Robbery, R.C. 2911.02(A)(2), a felony of the second degree; Count Ten: Strangulation, R.C. 2903.18(B)(2), a felony of the third degree; Count Eleven: Strangulation, R.C. 2903.18(B)(2), a felony of the third degree; Count Twelve: Abduction, R.C. 2905.02(A)(2), a felony of the third degree; Count Thirteen: Abduction, R.C. 2905.02(A)(2), a felony of the third degree; Count Fourteen: Abduction, R.C. 2905.02(A)(2), a felony of the third degree; Count Fifteen: Domestic Violence, R.C. 2919.25(A), a felony of the fourth degree; Count Sixteen: Domestic Violence, R.C. 2919.25(A)(D)(3), a felony of the fourth degree; and Count Seventeen: Disrupting Public Services, R.C. 2909.04(A)(3), a felony of the fourth degree.

*The jury trial*

**{¶3}** M.W. and Williams had been together for 12 years and have four children together. The couple married in February, 2022.

**{¶4}** M.W. testified that around Christmas, 2022, she received a message from Williams' girlfriend, R.N., which stated that she had been with Williams since September, 2022. M.W. testified that Williams blocked R.N.'s on M.W.'s phone, and the couple decided to try and work on their marriage.

**{¶5}** On New Year's Eve, Williams called the police to do multiple welfare checks on M.W. Williams told the police that M.W. was going to kill herself. M.W. testified that she learned that Williams was in Niagara Falls with R.N. at that time, so she decided that she wanted to end the relationship.

**{¶6}** M.W. testified that she told Williams that he could move out of the house, the couple could get a divorce, split custody of the children, and co-parent. The couple tried this arrangement for a while. Williams would come over to the house "here and there" and things seemed to be going okay. Williams took his clothing and moved out of the house in March, 2023. M.W. testified that there were video cameras inside of the house that Williams could remotely access. She turned off the cameras after Williams moved out of the house. M.W. testified that she began dating another person in April, 2023.

*April 28, 2023*

**{¶7}** On the morning of April 28, 2023, M.W. was sleeping with her daughter in her daughter's room when she woke up to Williams standing over her. M.W. asked Williams what he was doing there, and why he had her phone in his hand. Williams replied, "So you want to be talking to other people and have somebody at my house?" When M.W.

asked Williams what he was talking about, Williams dragged her out of bed, told her the kids were not going to school that day, and that they were going to have a family day. Williams then took her into her bedroom, punched her, hit her multiple times in the chest and jaw, and strangled her. He told M.W. that she was, "disrespecting him and playing on his name by talking to another man."

{¶8} After the assault, Williams had sex with M.W. She did not want to have sex, but she was afraid of him, "I had just took a beating, so I wasn't really going to tell him no." 1T. at 172. She went along with the sex because she "didn't want to get hit anymore." Id. at 259. It was at that time that Williams gave her several hickeys on her neck, telling her that "everybody was going to know that [she] was his." Id. at 173.

{¶9} Eventually, things calmed down and the couple left the bedroom. M.W. testified that it was getting close to the time for one of their daughters to get home from school, so she needed to get the children something to eat. They all got into her car and drove to Taco Bell to get the children food, and then to Quonset Hut, where she bought Williams a vape. M.W. agreed that Williams gave her the phone back long enough for her to take some selfies in the car; she smiled in those pictures to keep up appearances for the kids.

{¶10} Once they arrived back at the house, Williams said that if she gave him money to get food, he would leave her alone. Williams' girlfriend was getting off work soon, and his girlfriend did not know that Williams came over to M.W.'s house. After he left, M.W. packed their clothes and went to her mom's in Alliance.

{¶11} M.W.'s mother noticed the bruises on her neck, so she told her mother about what happened. M.W. testified that her mother told her to call the police, but she did

not, and instead she asked her mother for makeup to cover the bruises. M.W. testified that she took the make-up with her to a friend's house, where she stayed the night. The following day, M.W. went back to her mother's house to pick up her children and drove back to her house in Canton to get clothes for herself and the children.

*April 29, 2023*

{¶12} When M.W. arrived home around 9:30 a.m., she planned to get additional clothes, take the kids back to her mom's, and then go to work because she was afraid Williams would come back to the house. M.W. was not going to report the abuse; nevertheless, she decided to make a police report, so she parked her car in front of the house, and called 9-1-1. M.W. testified that an officer came to her house, and she stood on the front porch of her house and gave him the report.

{¶13} M.W. did not know that Williams was in the house when she called 9-1-1 because he had parked his car two blocks away. After the police left, she went inside to get their things, but when she went upstairs and opened her daughter's bedroom door, Williams jumped out of the closet and said, "Oh, so you're going to call the police on me? You thought I wasn't here, huh? You're going to die today." 1T. 178; 179; 266. The kids started screaming, so Williams told the kids to sit down and watch TV. As M.W. tried to go down the steps to leave, Williams grabbed her by her hair and yanked her back up the steps and told her, "This is going to be a tortuous day for you, and by the end of tonight you won't be breathing." Id. at 179. Williams told her he was going to kill her and this would be her last day on earth. Id. at 265-266.

{¶14} Williams took her in the bedroom, shut the door, accused her of sleeping with someone else, and told her to pull her pants down. 1T. at 180. Williams then pushed

her down on the bed and put his hands around her neck and strangled her while telling her that this is how her brother felt hanging from the tree (her brother committed suicide in September of 2023) and to make sure she said "hi" to him when she got there. Williams stopped strangling M.W. long enough for her to catch her breath, but he would not let her put her pants back on. When she scooted up in bed, he pushed her back down and shoved a sock in her mouth and plugged her nose so she could not breathe. It was at this time that their son snuck outside and called 9-1-1.

{¶15}  Williams told M.W. that he was going downstairs to get a garbage bag to smother her. M.W. testified that once Williams heard the knock at the door, he came back up the stairs and told her that he had to make this quicker than expected and tried to shove a handful of pills in her mouth, but she kept her mouth shut and all the pills fell on the floor. M.W. testified that the knock at the door was the police, because the officer announced that it was the police.

{¶16}  Williams then went to the window and told M.W. to "just tell them (police) that this is a misunderstanding . . . I'm about to go to jail." Id. at 183. Williams claimed that they would be a family again and make it work if she would just tell the police that it was all a misunderstanding, and their son was scared and called 9-1-1. Id. at 183. Williams had the girls and M.W. stand close to the window so that the police could see they were alive, but the police could not see M.W. was hurt. Williams told the girls to tell the police that everything was okay.

{¶17}  The police ask Williams multiple times to come out of the house or let her and the kids out of the house, but he would not let them out. Any time that M.W. went near the stairs, Williams would grab her arm and pull her back up saying, "We're not going out

yet." 1T. at 184, 267. M.W. was afraid, she felt like a hostage, and thought Williams would hurt her if she tried to leave. Id. at 245, 247.

{¶18} Soon, people were gathering outside of the house, yelling at Williams to come out. M.W. heard Williams tell the police that the only way he was coming out was if they shot him. M.W. promised Williams that she would tell the police it was all a misunderstanding because she wanted to get out of the house. Williams told Officer Henderson that he would come outside if she gave him a cigarette and a drink. As the four of them went downstairs to the living room, he told M.W. that he would take the five-year-old girl with him out the side door because he was afraid he would be shot. M.W. went out the front door and straight to a police cruiser.

{¶19} M.W. was taken by squad to the hospital. After about eight hours, she asked to leave because all her tests were done and she wanted to get back to her kids. M.W. described her injuries. She testified that her jaw was numb for approximately two months from nerve damage that occurred when Williams pushed the sock in her mouth and pushed on her bottom teeth. She further testified to bruises on her chest, jaw, arms, and ear, and a slight cut under her eye. 1T. at 196-198; State's Exhibits 1-L through 1-T. She testified that most of the bruising was from the April 28th incident however, some occurred during the strangulation and when Williams slapped her ear during the April 29th incident.

{¶20} M.W. reported the punching, assault, and strangulation, but not the rape, to the hospital staff. State's Exhibit 10. M.W. went through a battery of tests including a CAT scan of her brain and chest, and a CTA (angiogram) of her neck and head due to the location of the contusions, bruising, and abrasions on her head, neck, chest, and jaw, and her report of strangulation. Id. The physician documented that M.W. was only four foot,

ten inches tall, and that she had edema and swelling of her jaw and scattered ecchymosis (bruising) and erythema (redness) of her neck. In addition, he ordered bloodwork, intravenous fluids, and a pain shot. Id. The nurses documented that M.W.'s pain was a 7 and a 10 on a scale of 1 to 10. Id.

{¶21}  M.W. did not think that Williams would actually kill her until she found a gun on top of the cupboard a few days later. She did not tell the police about the gun because she was afraid, and Williams always told her that if the police became involved it would be worse for her. Nevertheless, M.W. testified that she thought Williams was going to hurt her "pretty bad."

{¶22}  Officer Jack Henderson testified that he was working as a Canton Police Officer. on April 29, 2023, and responded to M.W.'s residence on that day to take a report about an incident that took place on the day prior. He took the report from M.W. outside in front of the residence. He noted that M.W. had visible bruising on her chest, face, and ear. Officer Jack Henderson identified his body camera video as State's Exhibit 3. He also took several photos of M.W.'s injuries that day. M.W. declined medical assistance and did not mention any allegation of strangulation that happened on April 28, 2023.

{¶23}  Officer Michael Brown of the Canton Police Department testified that on April 29, 2023, he was dispatched to a home on Arnold Avenue in Canton, Ohio in reference to a juvenile calling 9-1-1 to report that his mother was possibly being choked to death. When he arrived on scene, he was met by the juvenile who made the call, and he secured the juvenile in a patrol car for safety, and then began to knock on the door to the residence. Officer Brown identified State's Exhibit 2 as his body camera video from this incident. Officer Brown testified that he requested another car to respond, and eventually

Officer Jenn Henderson arrived on scene, and she was able to contact somebody inside of the residence. Officer Brown testified that he grabbed his long gun while on scene, which he used for deterrent purposes. He also requested a K-9 unit from a neighboring jurisdiction, testifying that K-9's are also excellent deterrents. Officer Brown testified that he did not contact anyone in the residence when he initially knocked on the door, and likewise did not hear any yelling or screaming.

{¶24} Officer Jenn Henderson testified that there was a 90-minute encounter with Williams on April 29, 2023, asking him to come outside, and she frequently spoke with him during this encounter. Officer Henderson identified State's Exhibit 4 as her body camera video from the incident. At one point during the encounter, Williams was speaking to another person on the street about selling him his motorcycle. Williams eventually came out of the residence with his daughter, and requested a cigarette, so they immediately placed him in handcuffs and gave him a cigarette.

*The defense case*

{¶25} R. N., Williams's girlfriend, admitted she still talked to him almost every day, and in fact, spoke with him the night before she testified about what she would say on the stand. She knew Williams was married to M.W. while they were boyfriend and girlfriend. She denied that he was living with her and instead testified that he stayed maybe twice; and they often went weeks without him staying. R.N. admitted that Williams had clothes at her place and that they had brought TVs over in April from his house. She claimed that Williams was living with his brother, his friends, his cousin, or at his house.

{¶26} Darnell Williams, the younger brother of Williams, testified that Williams lived in two homes, "he had a home with [M.W.], but he also had a home when he was

staying with [R.N.]." Darnell testified, "[Williams] didn't stay with me. He didn't live with me, no." Darnell said the plan on April 29th was to rent a U-Haul and move out the rest of Williams' belongings, but instead, he just dropped Williams off at the home and left for work. When his mom started calling him about his brother, Darnell had a video call with Williams who told him that his house was surrounded by police. Darnell claimed that everyone in the house looked fine, but he told Williams to go outside and comply so that he would not escalate the situation. Darnell contended that no one appeared to be held against their will despite how long the situation took.

{¶27} Shaneva Williams, Williams' mother testified. She has known M.W. since M.W. was sixteen years old. Shaneva testified that she knew that Williams had another girlfriend and had spoken to M.W. about it.

{¶28} Shaneva was living in Georgia at the time, but testified that she spoke to M.W. the morning of April 29th, and claimed she sounded fine. She testified that M.W. did not mention that any incident occurred on the day prior, which Shaneva found unusual because M.W. always told her whenever there was a fight with Williams. Shaneva testified that she believes that M.W. is lying about the incident that happened on April 29, 2023.

{¶29} Williams testified in his own defense. Williams admitted that he has not always been a great husband or boyfriend to M.W., and that he was previously charged with domestic violence that occurred in their relationship in 2013. Williams testified that he pled guilty to the charge in 2013 and had not been in trouble for anything since 2013 until he was arrested on the current charges.

{¶30}   Williams testified that in September, 2022, he began to have an affair with R.N. In April, 2023, he was still having an affair with R.N. but was living at the house with M.W.

{¶31}   Williams testified that he worked from 6:30 pm on April 27, 2023, until 7:00 am on April 28, 2023. He went home to his house after work. Williams went upstairs and into his bedroom; however, he did not see M.W. He checked his daughter's room, and found M.W. sleeping in that room. After taking a shower and putting his pajamas on, he woke M.W. Williams testified that when M.W. woke up she realized the children were going to be late for school; however, she did not feel like taking them.

{¶32}   The couple decided not to take the children to school that day because they were late. Williams denied beating M.W. that morning, nor did he slap or punch her that day, or accuse her of being with other men. Instead, he and M.W. went into their bedroom, laid down, and then had sex. Williams testified that he and M.W. had sex three times that day, and in between they would discuss their relationship and everything that they had been through that year. Williams did not notice any bruising on M.W.'s body because she did not take her shirt off, but he did give her three hickeys on her neck. Williams claimed that he and M.W. were in bed together that morning from 8:30 am to 12:00 pm, when one of his daughter's knocked on the door to say that she was hungry. They then went downstairs; however, there was no food in the house, so they decided to go to Taco Bell.

{¶33}   After Taco Bell, they drove back to the house, and the children played outside while he and M.W. sat in the car and talked. While they were sitting in the car, they took some pictures together. State's Exhibit 9. Williams also identified Defense Exhibit 4,

which was a Snapchat video that they recorded together and were laughing. Williams testified that there is no bruising on M.W. in these videos or pictures, and he also did not see any bruising on her that day. Williams learned later that M.W. sent those selfies to R.N. to let her know that they were together, and that R.N. was stupid for thinking that she could take Williams away from her.

{¶34} After talking in the car, they drove around the corner to the gas station to get some drinks, and then went back to the house. When they went inside, Williams saw several bills in a pile on the table that were three months behind and set for disconnection. Williams claimed that he had given M.W. money to pay the bills.

{¶35} M.W. started to pack the children up to take to her mother's house because she said she was going out with her friend that night. Williams expressed concern to M.W. about her priorities because he did not believe she should be going out if the bills were not being paid and the house was a mess. Williams admitted they had a disagreement over that issue, but it never got physical. Williams claimed he left the residence around 3:00 pm.

{¶36} On April 29th, Williams claimed that he went to the house to move the rest of his belongings out because he decided that R.N. was more of a fit for him. Williams testified that due to an expired identification card, he was denied a U-Haul, so his brother dropped him off back at the house to retrieve his other identification cards. His brother left for work and Williams went inside the house. Williams denied hitting M.W., attempting to shove pills down her throat, or strangling her. He denied saying anything about her brother dying. Williams contended that he could not explain his son's 9-1-1 call.

{¶37} Williams would not come out of the house when the police asked because he was scared of the assault rifles. He denied holding his family hostage stating, "I never made her feel like she couldn't leave. I told her to go out." Williams "knew what the police was going to do because I know how they get down . . . I knew they was going to try to come with some weird stuff like kidnapping or abduction."

{¶38} Williams asked for a cigarette before he agreed to leave the house; he also changed into different clothes and testified that M.W. also changed her shirt. He admitted that he did speak to his brother and a cousin on the phone while he was still inside the house; and he also admitted that he spoke to someone about selling his motorcycle.

{¶39} Williams claimed he never assaulted or touched M.W. He admitted that he did not comply with the officers' orders to come out of the house in a timely fashion. Williams said he would take accountability for not coming out of the house, but he would not agree that he used his kids as shields, or kidnapped anyone. He further testified that M.W. did not have bruises, but rather hickeys. Williams denied hiding in the closet, he denied strangling M.W., and he denied what his son said in the 9-1-1 call.

*Verdict and Sentence*

{¶40} Following deliberations, the jury returned verdicts finding Williams guilty of two counts of strangulation and two counts of domestic violence, with a finding that Williams had a prior misdemeanor domestic violence conviction. The state filed a nolle prosequi on the robbery and disrupting public services charges. The jury found Williams not guilty on the remaining charges.

{¶41} On December 11, 2023, Williams appeared for a sentencing hearing. After affording the parties an opportunity to speak, the trial judge sentenced Williams to a stated

prison term of 36 months on Count 10, Strangulation; a stated prison term of 12 months on Count 11, Strangulation, to be served consecutively with Count 10; a stated prison term of 18 months on Count 15, Domestic Violence, to be served concurrently with Count 10; and a stated prison term of 18 months on Count 16, Domestic Violence, to be served concurrently with Count 10. The aggregate sentence imposed was 48 months.

*Assignments of Error*

{¶42} Williams raises four Assignments of Error,

{¶43} "I. THE APPELLANT'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE, AND MUST BE REVERSED.

{¶44} "II. THE APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF HIS RIGHTS UNDER THE 6TH AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.

{¶45} "III. THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING APPELLANT'S MOTION TO CORRECT JAIL TIME CREDIT CALCULATION.

{¶46} "IV. THE TRIAL COURT ABUSED ITS DISCRETION BY ADMITTING STATE'S EXHIBIT 11 AND 12 OVER APPELLANT'S OBJECTION, AND APPELLANT WAS DENIED A FAIR TRIAL DUE TO THE CUMULATIVE ERRORS OF THE TRIAL COURT."

I.

{¶47} In his First Assignment of Error, Williams argues that his convictions for strangulation are against the sufficiency and the manifest weight of the evidence[1].

---

[1] Williams does not challenge his convictions for Domestic Violence.

Specifically, Williams contends that the state failed to present sufficient evidence of substantial risk of death.

**Standard of Review – Sufficiency of the Evidence**

{¶48}  The Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury...."  This right, in conjunction with the Due Process Clause, requires that each of the material elements of a crime be proved to a jury beyond a reasonable doubt. *Alleyne v. United States*, 570 U.S. 99 (2013); *Hurst v. Florida*, 577 U.S. 92 (2016). The test for the sufficiency of the evidence involves a question of law for resolution by the appellate court. *State v. Walker*, 2016-Ohio-8295, ¶30; *State v. Jordan,* 2023-Ohio-3800, ¶13. "This naturally entails a review of the elements of the charged offense and a review of the state's evidence."  *State v. Richardson*, 2016-Ohio-8448, ¶13.

{¶49}  When reviewing the sufficiency of the evidence, an appellate court does not ask whether the evidence should be believed. *State v. Jenks*, 61 Ohio St.3d 259(1991), paragraph two of the syllabus, *superseded by State constitutional amendment on other grounds as stated in State v. Smith, 80 Ohio St.3d 89, 102 at n.4, (1997)*; *Walker,* 150 Ohio St.3d at ¶30. "The relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."  *Jenks* at paragraph two of the syllabus. *State v. Poutney,* 2018-Ohio-22, 97 N.E.3d 478, ¶19. Thus, "on review for evidentiary sufficiency we do not second-guess the jury's credibility determinations; rather, we ask whether, '*if believed*, [the evidence] would convince the average mind of the defendant's guilt beyond a reasonable doubt.'"  *State v. Murphy*, 91 Ohio St.3d 516,

543(2001), *quoting Jenks* at paragraph two of the syllabus; *Walker* 150 Ohio St.3d at ¶31. We will not "disturb a verdict on appeal on sufficiency grounds unless 'reasonable minds could not reach the conclusion reached by the trier-of-fact.'" *State v. Ketterer*, 111 Ohio St.3d 70, ¶ 94, *quoting State v. Dennis*, 79 Ohio St.3d 421, 430 (1997); *State v. Montgomery*, 148 Ohio St.3d 347, ¶74.

{¶50}  Williams does not deny he impeded the normal breathing or circulation of the blood by applying pressure to the throat or neck, or by covering the nose and mouth of M.W. Williams argues only that the state failed to prove that he created a substantial risk of serious physical harm to M.W. by means of strangulation or suffocation.

{¶51}  R.C. 2901.01 provides, in relevant part,

(A)(5) "Serious physical harm to persons" means any of the following:

(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;

(b) Any physical harm that carries a substantial risk of death;

(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

{¶52}  In *State v. Brown*, this Court noted,

The degree of harm that rises to the definition section's level of "serious" is not a precise science, especially since the statute utilizes descriptors such as "substantial," "temporary," "acute," and "prolonged." *State v. Irwin*, 7th Dist. No. 06MA20, 2007-Ohio-4996, ¶ 37. Moreover, whether physical injuries arise to the level of serious physical harm is typically a question of the weight rather than the sufficiency of the evidence. Id., *citing State v. Salemi*, 8th Dist. No. 81091, 2002-Ohio-7064, ¶ 34. In addition, Ohio courts have also determined that "serious physical harm" exists where the injuries caused the victim to seek medical treatment. *Nicholson, supra*, 2019-Ohio-1058, at ¶ 22, *citing State v. Muncy*, 4th Dist. Scioto No. 11CA3434, 2012–Ohio–4563, ¶ 23.

2019-Ohio-3486, ¶27 (5th Dist.). *See also, State v. Johns,* 2011-Ohio-6823, ¶15 (10th Dist.) (summarizing cases finding various injuries enough to support finding of serious physical harm); *State v. Worell*, 2005-Ohio-1521, ¶48 (10th Dist.) (same); *State v. Crossity*, 2017-Ohio-8382, ¶23(1st Dist.) (same).

{¶53} The state need not present expert medical testimony to establish the element of serious physical harm. *Brown,* 2019-Ohio-3486, ¶ 29, citing *State v. Nicholson*, 2019-Ohio-1058, ¶ 22, *appeal not allowed*, 2019-Ohio-2780, *citing State v. Scott*, 2015-Ohio-4170, ¶24 (4th Dist.); *see also, State v. Driesbaugh*, 2003-Ohio-3866, ¶46 (11th Dist.) [rejecting argument that expert testimony is required to establish serious physical harm]; *State v. Fahringer*, 2000-Ohio-1741(3rd Dist.) [finding serious physical harm despite absence of victim's testimony and expert medical testimony]. Rather, proof of "serious physical harm is an element, like any other, that the state must prove beyond a reasonable

doubt. *Brown,* 2019-Ohio-3486, ¶ 29; *State v. Laney*, 2019-Ohio-2648, ¶27 (6th Dist.), *citing State v. Stansel*, 2019-Ohio-1906, ¶29 (2nd Dist.), *State v. Redman*, 2016-Ohio-860, ¶24 (3rd Dist.), *and State v. Petty*, 10th Dist. Franklin Nos. 11AP-716, 2012-Ohio-2989, ¶29 (10th Dist.).

{¶54} In challenging his conviction, Williams cites *State v. Triplett*, 2023-Ohio-4644(8th Dist.). The *Triplett* Court found that it was unnecessary to decide whether the defendant's act of choking the victim constituted a substantial risk of death because the defendant's act of bludgeoning the victim with a bottle constituted serious physical harm, but stated that if it did decide the issue, it would find that the defendant's choking the victim did not constitute a substantial risk of death because there was no evidence in the record that the victim ever lost consciousness or that the force applied in the chokehold was one that carried a substantial risk of death. *State v. Osborne*, 2024-Ohio-2173, ¶24. Subsequently, the Eight District Court of Appeals in *Osborne,* questioned the previous court's statements concerning loss of consciousness, and "disagree[d] that the loss of consciousness in a choking or strangling incident is always required to demonstrate a substantial risk of death, [however,] as in *Triplett*, we need not decide whether Osborne placed R.O. at a substantial risk of death when he strangled her because there is sufficient evidence in the record demonstrating that he created a substantial risk of serious physical harm to her when he placed a towel around her neck, strangled her, violently shook her head, and pushed her into the bathroom door." Id. at ¶25.

{¶55} In the case at bar, M.W. was taken to the hospital and underwent CAT scans of her brain and chest with and without contrast, and CTA's (angiograms) of her head and

neck, due to the location of her injuries. In the medical records, the physician documented visible injuries including edema and swelling of her jaw and scattered ecchymosis and erythema of her neck, as well as contusions, bruising, and abrasions on her head, neck, chest, jaw, and ear. M.W. testified that her jaw was numb for over two months from Williams pressing the sock into her mouth and pressing on her teeth and jaw. The medical records indicated M.W. complained of pain at a 7 and a 10 on a scale of 1-10, throughout her emergency room visit. In addition, officers observed, documented, photographed, and testified about the visible injuries found on M.W. *See, e.g.*, State's Exhibit 1A -1T.

**{¶56}** M.W. further testified that Williams stuffed a sock in her mouth and held her nose closed and that she could not breathe.

**{¶57}** Viewing this evidence in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that Williams did create a substantial risk of serious physical harm to M.W. by means of strangulation or suffocation. We hold, therefore, that the state met its burden of production regarding each element of the crime of Strangulation for which Williams was indicted and, accordingly, there was sufficient evidence to submit the charge to the jury and to support Williams' convictions.

### Standard of Review – Manifest Weight

**{¶58}** Williams next argues that his convictions are against the manifest weight of the evidence. Williams contends that M.W.'s inconsistencies in not mentioning that Williams had strangled her on August 28, 2023 when reporting the incidents renders her testimony unreliable.

{¶59} The term "'manifest weight of the evidence'. . . relates to persuasion." *Eastley v. Volkman*, 2012-Ohio-2179, ¶19. It "concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.'" (Emphasis deleted.) *State v. Thompkins*, 78 Ohio St.3d 380, 387(1997), *superseded by constitutional amendment on other grounds as stated by State v. Smith, 80 Ohio St.3d 89, 102 at n.4 (1997)*; *State v. Martin*, 2022-Ohio-4175, ¶ 26.

{¶60} Weight of the evidence addresses the evidence's effect of inducing belief. *Thompkins*, at 386-387; *State v. Williams,* 2003-Ohio-4396, ¶83. When a court of appeals reverses a judgment of a trial court on the basis that the decision is against the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony. *State v. Jordan*, 2023-Ohio-3800; *Thompkins* at 387, *citing Tibbs v. Florida*, 457 U.S. 31, 42(1982) (quotation marks omitted); *State v. Wilson,* 2007-Ohio-2202, ¶25, citing *Thompkins.*

{¶61} In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact. *Eastley,* 2012-Ohio-2179 at ¶ 21; *In re Z.C.,* 2023-Ohio-4703, ¶ 14. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the [trier of fact] is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

{¶62} When there is conflicting testimony presented at trial, a defendant is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented. "'If the evidence is susceptible of more than one construction, the

reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Seasons Coal Co., Inc* at fn. 3, *quoting* 5 Ohio Jur.3d, Appellate Review, §603, at 191-192 (1978); *In re Z.C.,* 2023-Ohio-4703, ¶14. In *Cross v. Ledford,* 161 Ohio St. 469, 477(1954), the Supreme Court further cautioned,

> The mere number of witnesses, who may support a claim of one or the other of the parties to an action, is not to be taken as a basis for resolving disputed facts. The degree of proof required is determined by the impression which the testimony of the witnesses makes upon the trier of facts, and the character of the testimony itself. Credibility, intelligence, freedom from bias or prejudice, opportunity to be informed, the disposition to tell the truth or otherwise, and the probability or improbability of the statements made, are all tests of testimonial value. *Where the evidence is in conflict, the trier of facts may determine what should be accepted as the truth and what should be rejected as false*. See *Rice v. City of Cleveland*, 114 Ohio St. 299, 58 N.E.2d 768.

161 Ohio St. at 477-478. (Emphasis added).

{¶63} The interplay between the presumption of correctness and the ability of an appellate court to reverse a verdict based on the manifest weight of the evidence has been stated as follows, "'Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.'" *Seasons Coal Co.,* 10 Ohio St.3d at 80, *quoting C.E. Morris Co. v. Foley Construction Co.*, 54 Ohio St.2d 279, 280 - 281. *See,*

*also*, *In re: Z.C.,* 2023-Ohio- 4703, ¶15; *Frankenmuth Mut. Ins. Co. v. Selz*, 6 Ohio St.3d 169, 172 (1983); *In re Sekulich,* 65 Ohio St.2d 13, 16 (1981).

**{¶64}** If a court of appeals determines that a judgment is against the manifest weight of the evidence, the proper remedy is a remand for a new trial. 2023-Ohio-4703, ¶16, citing *Eastley* at ¶ 22. However, "[r]eversal on the manifest weight of the evidence and remand for a new trial are not to be taken lightly." *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 31; *In re: Z.C.,* 2023-Ohio- 4703, ¶16.

**Issue for Appellate Review**: Whether *the jury clearly lost their way and created such a manifest miscarriage of justice that the convictions must be reversed and a new trial ordered*

**{¶65}** Because M.W. and Williams testified and were subject to cross-examination during the trial, the jury was able to judge for themselves their appearance on the stand, manner of testifying, the reasonableness of their testimony, the accuracy of memory, frankness or lack of it, and any bias they may have. The intelligence, memory, disposition to tell the truth or otherwise, and the probability or improbability of the statements made, are all tests of each witness' testimonial value for the jury to resolve.

**{¶66}** While the trier of fact may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. Craig*, 1999 WL 29752 (10th Dist. Mar 23, 2000) *citing State v. Nivens*, 1996 WL 284714 (10th Dist. May 28, 1996). Indeed, the trier of fact need not believe all of a witness' testimony, but may accept only portions of it as true. *State v. Raver*, 2003–Ohio–958, ¶ 21 (10th Dist.), *citing State v. Antill*,

176 Ohio St. 61, 67(1964); *State v. Burke*, 2003–Ohio–2889 (10th Dist.), *citing State v. Caldwell*, 79 Ohio App.3d 667 (4th Dist. 1992).

**{¶67}** In addition to the testimony, the jury had photographs taken at or near the time of the incidents, body camera videos from the responding police officers, and the medical records of M.W.

**{¶68}** Upon review of the entire record, weighing the evidence and all reasonable inferences as a thirteenth juror, including considering the credibility of witnesses, we find that the jury's verdict is supported by some competent, credible evidence going to all the essential elements of the case. Accordingly, the judgment cannot be reversed by a reviewing court as being against the manifest weight of the evidence. *Seasons Coal Co.,* 10 Ohio St.3d at 80, *quoting C.E. Morris Co. v. Foley Construction Co.*, 54 Ohio St.2d 279, 280 - 281. *See, also, In re: Z.C.,* 2023-Ohio- 4703, ¶15; *Frankenmuth Mut. Ins. Co. v. Selz*, 6 Ohio St.3d 169, 172 (1983); *In re Sekulich,* 65 Ohio St.2d 13, 16 (1981).

**{¶69}** Williams' First Assignment of Error is overruled.

II.

**{¶70}** In his Second Assignment of Error, Williams argues he was denied effective assistance of counsel due to his trial counsel's failure to request a jury instruction on the inferior degree offense of strangulation pursuant to R.C. 2903.18(B)(3).

**{¶71}** Before trial, Williams filed a written request for the trial judge to instruct the jury on the lesser included offense of unlawful restraint with respect to the Kidnapping and Abduction counts of the Indictment. [Docket Number 69]. The trial judge overruled that motion. 2T. at 542-544. The jury subsequently found Williams not guilty of those counts. Williams did not request orally, or in writing, a jury instruction on strangulation pursuant to

R.C. 2903.18(B)(3), which requires only a finding that the offender "cause or create a substantial risk of *physical* harm" as opposed to *serious physical* harm.

**Standard of Appellate Review**

{¶72} To obtain a reversal of a conviction on the basis of ineffective assistance of counsel, the defendant must prove (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome of the proceeding. *Strickland v. Washington*, 466 U.S. 668, 687-688 (1984); *Andtus v. Texas*, 590 U.S. 806, 813-814 (2020).

{¶73} A defendant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other. *Strickland* at 697; *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000).

*Jury Instructions*

{¶74} "After arguments are completed, a trial court must fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder." *State v. Comen*, 50 Ohio St.3d 206, 208, (1990), paragraph two of the syllabus.

{¶75} "Even though an offense may be statutorily defined as a lesser included offense of another, a charge on such lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." *State v. Thomas*, 40 Ohio St.3d 213, paragraph two of the syllabus. In making this determination, the court must view

the evidence in a light most favorable to defendant. *State v. Smith*, 89 Ohio St.3d 323, 331, (2000); *State v. Wilkins*, 64 Ohio St.2d 382, 388 (1980).

**{¶76}** Nevertheless, an instruction is not warranted every time any evidence is presented on a lesser-included offense. There must be "sufficient evidence" to "allow a jury to reasonably reject the greater offense and find the defendant guilty on a lesser included (or inferior-degree) offense." *State v. Shane*, 63 Ohio St.3d at 632–633, *State v. Conway*, 2006–Ohio–791, ¶134. *See also*, *State v. Ortiz*, 2016-Ohio-354, ¶¶ 27-28 (5th Dist.).

*Plain Error*

**{¶77}** When a defendant does not request a specific jury instruction and fails to object to the jury instructions as given, he waives all but plain error. *State v. Underwood*, 3 Ohio St.3d 12 (1983), syllabus; *State v. Lang*, 2011-Ohio-4215, ¶145.

**{¶78}** In *Neder v. United States*, 527 U.S. 1, (1999) the United States Supreme Court held that because the failure to properly instruct the jury is not in most instances structural error, the harmless-error rule of *Chapman v. California*, 386 U.S. 18 (1967) applies to a failure to properly instruct the jury, for it does not necessarily render a trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.

**{¶79}** Crim.R. 52(B) provides that, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. In order to find plain error under Crim.R. 52(B), it must be determined, but for the error, the outcome of the trial clearly

would have been otherwise. Id. at paragraph two of the syllabus. The defendant bears the burden of demonstrating that a plain error affected his substantial rights. *United States v. Olano*, 507 U.S. at 725, 734 (1993), *State v. Perry*, 101 Ohio St.3d 118, 120 (2004). "Even if the defendant satisfies this burden, an appellate court has discretion to disregard the error and should correct it only to 'prevent a manifest miscarriage of justice.'" *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002), *quoting State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. *Perry, supra*, at 118, 802 N.E.2d at 646.

*All-or-Nothing Defense*

{¶80}  In *State v. Clayton*, 62 Ohio St.2d 45 (1980), the defendant was charged with and convicted of two counts of attempted murder. Id. at 45. On appeal, the defendant challenged trial counsel's decision not to request a jury instruction on the lesser-included offense of attempted voluntary manslaughter. Id. at 46, 48-49. The Ohio Supreme Court held that the decision not to request the mitigating instruction, despite being a "questionable" strategy, did not rise to the level of ineffective assistance of counsel. Id. at 48-49. Simply because there was "another and better strategy available" did not mean that counsel provided ineffective assistance. Id. at 49. In addition, the Supreme Court found the trial court did not commit plain error by failing to provide the jury instructions sua sponte. Noting that trial counsel's decision not to request an instruction on a lesser-included offense was based on "counsel's strategy to seek a total acquittal for [Clayton]," the court held that a defendant "cannot claim the protections of Crim.R. 52(B) to negate the effect of [a] tactical decision."  Id. at 47. The Court explained as follows:

> Even if the defendant did elicit some evidence of mitigating circumstances (fit of anger), he still had the right to intentionally waive a jury

> instruction on the lesser-included offense of attempted voluntary manslaughter. Having elicited some evidence in mitigation of attempted murder, the court had the duty to instruct on the lesser-included offense, but this in no way affected defendant's concomitant right, through his counsel, to waive the instruction.

Id. at 47, fn. 2. *See also, State v. Lloyd*, 2021-Ohio-1080(8th Dist.), ¶39. In *State v. Wine,* the court reiterated the implications of the plain error doctrine and the deference given to counsel's trial strategy, stating:

> In *Clayton*, this court held that defendant's counsel's decision not to request an instruction on lesser-included offenses — seeking acquittal rather than inviting conviction on a lesser offense — was a matter of trial strategy. Id. This court essentially said in *Clayton's* second footnote that although the trial court erred in not including the lesser-included-offense charge, the defendant waived that error in furtherance of his counsel's trial strategy. Once the defendant made his tactical gambit * * * he could not then successfully claim plain error upon appeal. This court thus concluded that the trial court's failure to instruct the jury on lesser-included offenses and the defendant's subsequent conviction "[did] not amount to a manifest miscarriage of justice and [was] not plain error." Id. at 47-48, 402 N.E.2d 1189. This court further concluded that although his strategy was questionable, Clayton's counsel did not provide ineffective assistance. Id. at 49, 402 N.E.2d 1189.

*State v. Wine*, 2014-Ohio-3948, ¶ 30[2]. As the Eighth District Court of Appeals observed:

> Thus, the Ohio Supreme Court has clarified that although "it is the quality of the evidence offered * * * that determines whether a lesser-included offense charge should be given to a jury," *Wine* at ¶ 26, the court's failure to provide jury instructions on lesser-included or inferior-degree offenses does not amount to plain error "[w]hen the decision not to request a particular jury instruction may be deemed to be part of a reasonable trial strategy," *State v. Mohamed*, 151 Ohio St.3d 320, 2017-Ohio-7468, 88 N.E.3d 935, ¶ 27, *citing Clayton* at 47-48, 402 N.E.2d 1189. "Put differently, a trial court does not commit plain error in failing to provide an unrequested jury instruction where the decision to not request the instruction could be considered trial strategy." *State v. Jones*, 4th Dist. Ross No. 16CA3574, 104 N.E.3d 34, 2018-Ohio-239, ¶ 27, *citing Mohamed* at ¶ 27.

*State v. Lloyd*, 2021-Ohio-1080(8th Dist.), ¶41.

**{¶81}** In the case at bar, Williams was originally charged with 17 counts. Williams filed a written request for jury instructions on the lesser offense of unlawful restraint with respect to the Kidnapping and Abduction counts of the Indictment. Therefore, the fact he did not file a written request, or orally request, a jury instruction with respect to the strangulation charges can be considered to be some evidence of counsels all-or-nothing strategy with respect to the strangulation charges.

---

[2] However, in *Wine*, the *state* requested an instruction on a lesser offense and the defendant objected to the giving of the instruction. The Court in *Wine* held that a defendant does not have the right to prevent a trial court from instructing a jury on lesser included offenses. The trial court, after reviewing the evidence, determines whether an instruction on lesser included offenses is appropriate.

**{¶82}** Before deliberations, the state dismissed Counts 9 and 17. Williams was convicted of four counts. The jury found Williams "not guilty" of the remaining eleven counts. We find that Williams has failed to demonstrate that counsel's decision not to request a jury instruction on the inferior-degree offense of strangulation did not fall within a reasonable all-or-nothing trial strategy.

**{¶83}** Even presuming that the instruction should have been requested under these circumstances and that the conduct could have justified both an acquittal for causing strangulation by causing serious physical harm and a conviction for strangulation by causing physical harm, it has been held that, "'when a conviction for the charged offense was supported by sufficient evidence, the failure to give a lesser-included offense instruction is harmless, since the result of the proceedings would not have been different but for the lack of the instruction.'" *State v. McCreary,* 2022-Ohio-2899, ¶74(5th Dist.), *quoting State v. Hall*, 2019-Ohio-4000, ¶26 (11th Dist.), *citing State v. Jevnikar,* 2016-Ohio-8113, ¶19 (11th Dist.). For Williams to be entitled to the alternative instructions, there needed to be evidence that could cause a jury to reasonably conclude that he did not cause "serious physical harm" to M.W. *State v. Lloyd,* 2022-Ohio-4259, ¶27. As we noted in our disposition of Williams's First Assignment of Error, sufficient evidence that Williams caused serious physical harm to M.W. was presented to the jury.

**{¶84}** Accordingly, Williams has failed to demonstrate both that (1) counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome of the proceeding. We further find the trial court did not commit plain error in failing to provide the jury the unrequested instructions.

**{¶85}**  Williams' Second Assignment of Error is overruled.

III.

**{¶86}**  In his Third Assignment of Error, Williams argues that the trial judge incorrectly awarded the number of days to be credited to his prison time. The state contends that we are without jurisdiction to address this Assignment of Error because Williams did not include within his Notice of Appeal an appeal from the January 11, 2024 Judgment Entry of the trial judge denying his motion for jail time credit.

*Alleged errors regarding jail-time credit may be raised by way of the defendant's*

*direct appeal of his criminal case*

**{¶87}**  Williams' sentencing hearing took place on December 11, 2023. Also, on December 11, 2023, the trial judge appointed counsel to represent Williams on appeal. On December 21, 2023, Williams filed, pro se, a handwritten Motion for Judicial Credit. The state did not file a response. By Judgement Entry filed January 11, 2024, the trial judge overruled Williams motion stating only that "Jail time credit has been appropriately applied."[3] On January 12, 2024, Williams, through counsel, filed his Notice of Appeal in the trial court.

**{¶88}**  A defendant alleging errors regarding an award of jail-time credit may raise that issue in his direct appeal of his criminal conviction, *State ex rel. Rankin v. Ohio Adult*

---

[3] It appears that Williams' right to counsel in the trial court during this time was in what can only be described as limbo. His appointed trial counsel's obligations to Williams ended at sentencing, and it is unclear whether his appellate attorney had any obligation to file a motion for jail time credit in the trial court, counsel having only been appointed to pursue Williams' appeal as of right. Thus, the procedure in this case seems at odds with the principle that "[a] defendant has no right to a 'hybrid' form of representation wherein he is represented by counsel, but also acts simultaneously as his own counsel." *State v. Keenan*, 81 Ohio St.3d 133, 138(1998), *citing McKaskle v. Wiggins*, 465 U.S. 168, 183, (1984). For whatever reason, the trial judge did not refer the pro se motion to either Williams' appointed trial counsel, or his appointed appellate attorney before ruling.

*Parole Auth.*, 2003-Ohio-2061, ¶ 10, or in a post sentence motion to correct jail-time credit pursuant to R.C. 2929.19(B)(2)(g)(iii). *State ex rel. Sands v. Culotta*, 2021-Ohio-1137, ¶12; *State ex rel. Sampson v. Parrott*, 82 Ohio St.3d 92 (1982); *State ex rel. Jones v. O'Connor*, 84 Ohio St.3d 426 (1999). In the case at bar, Williams did both. However, he has only filed one appeal from the trial judge's award of jail time credit. In overruling Williams' motion, the trial judge did not explain how she arrived at her jail-time credit calculation. Therefore, whether we consider the issue on direct appeal, or whether the trial judge's denial of Williams' pro se motion should have been included in the notice of appeal in this case, is, in essence, inconsequential. Under the facts of this case, the record is the same. The trial court's decision cannot, in any event, have res judicate effect on a reviewing Court.

{¶89} Based upon the decisions of the Ohio Supreme Court, Williams clearly may raise the issue concerning jail time credit in his direct appeal. He has done so in this case. The state agrees that Williams has raised this error in his direct appeal. [Appellee's brief at 26].

{¶90} The state's reliance on *State v. Jordan*, 2022-Ohio-563 (12th Dist.), is misplaced. The court of appeals in *Jordan* failed to recognize errors regarding an award of jail-time credit may be raised in a direct appeal of a defendant's criminal conviction. *State ex rel. Rankin v. Ohio Adult Parole Auth.*, 2003-Ohio-2061, ¶ 10. Prior to the enactment of R.C. 2929.19(B)(2)(g)(iii), an offender was able to seek correction of an error made in determining jail-time credit only on direct appeal. *State v. Thompson*, 2016-Ohio-2769, ¶ 11; *State v. Denham*, 2004-Ohio-4551, ¶9 (5th Dist.); *State v. Bennett*, 2011-Ohio-4597, ¶6 (10th Dist.). Motions to correct errors made in determining jail-time credit that were filed outside the time allowed for appeal were barred by the doctrine of res judicata.

*Thompson*, 2016-Ohio-2769, ¶11(Citations omitted). However, the Ohio Supreme Court subsequently held that an error in the calculation of jail-time credit is remediable in the ordinary course of law through *either* appeal *or* a motion for jail-time credit under R.C. 2929.19(B)(2)(g)(iii). *See, State ex rel. Jones v. O'Connor,* 84 Ohio St.3d 426, 426-427 (1999); *State ex rel. Williams v. McGinty*, 2011-Ohio-2641, ¶2; State *ex rel Ellis v. Chambers-Smith*, 2023-Ohio-2671, ¶32 (10th Dist.); *State v. Bryant*, 2020-Ohio-363, ¶17(10th Dist.); *State v. D'Apolito*, 2023-Ohio-33, ¶5 (7th Dist.); *State v. Price*, 2020-Ohio-6902, ¶19 (4th Dist.); *State v. Adams,* 2022-Ohio-1644, ¶25 (5th Dist.).

**{¶91}** Williams may not be entitled to multiple bites at the apple, however, he is entitled to at least one genuine bite. *Bryant*, ¶23. "[D]etermining whether an offender receives jail-time credit affects a substantial right…because receiving properly determined jail-time credit implicates an offender's liberty interest in being free from unauthorized incarceration… and the right to jail-time credit is protected by at least three statutory provisions." *State v. Thompson*, 2016-Ohio-2769, ¶ 9; *State v. Crossty*, 2016-Ohio-3265, ¶ 11(1st Dist.). Therefore, because we have not previously ruled on this issue, and based upon the Ohio Supreme Court's directives on this issue that errors in the award of jail time credit may be raised in a direct appeal, we will, in the interest of justice, address Williams assignment of error.

### *Jail Time Credit*

**{¶92}** With respect to jail-time credit, the Ohio Supreme Court has instructed the courts that,

> The practice of awarding jail-time credit, although now covered by
>
> state statute, has its roots in the Equal Protection Clauses of the Ohio and

United States Constitutions. Recognizing that the Equal Protection Clause does not tolerate disparate treatment of defendants based solely on their economic status, the United States Supreme Court has repeatedly struck down rules and practices that discriminate against defendants based solely on their inability to pay fines and fees. *See Griffin v. Illinois* (1956), 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (a state cannot deny appellate review to defendants unable to afford a transcript); *Williams v. Illinois* (1970), 399 U.S. 235, 90 S.Ct. 2018, 26 L.Ed.2d 586 (a state may not imprison a defendant beyond the statutory maximum based solely on his inability to pay a fine); *Tate v. Short* (1971), 401 U.S. 395, 91 S.Ct. 668, 28 L.Ed.2d 130 (a state may not impose a fine as a sentence and then automatically convert it to jail time based upon the defendant's inability to immediately pay the fine). Relying on the principle set forth in such cases, courts have held that defendants who are unable to afford bail must be credited for the time they are confined while awaiting trial. "The Equal Protection Clause requires that all time spent in any jail prior to trial and commitment by [a prisoner who is] unable to make bail because of indigency must be credited to his sentence." (Emphasis sic.) *Workman v. Cardwell* (N.D. Ohio 1972), 338 F.Supp. 893, 901, *vacated in part on other grounds (C.A.6, 1972), 471 F.2d 909. See also White v. Gilligan* (S.D. Ohio 1972), 351 F.Supp. 1012.

This principle is codified in Ohio at R.C. 2967.191, which states that "[t]he department of rehabilitation and correction shall reduce the stated prison term of a prisoner * * * by the total number of days that the prisoner

was confined for any reason arising out of the offense for which the prisoner was convicted and sentenced, including confinement in lieu of bail while awaiting trial * * *."

*State v. Fugate*, 2008–Ohio–856, ¶ 7–9; *State v. Morris*, 2018-Ohio-830(5th Dist.), ¶15.

**{¶93}** Although it is the adult parole authority's duty to reduce the term of incarceration by the number of days served prior to sentencing, it is the responsibility of the sentencing court to properly calculate the amount of days for which such credit may be extended. *State v. Carroll,* 2002-Ohio-769 (5th Dist.), *citing State ex rel. Corder v. Wilson*, 68 Ohio App.3d 567 (10th Dist. 1991). Since the provisions are mandatory, the trial court's failure to properly calculate such credit and include it in the body of the sentencing order is plain error. *State v. Neville*, 2004-Ohio-6840, (7th Dist.), ¶ 14; *State v. Burden*, 2022-Ohio-569 (12th Dist.), ¶25. It appears to be well-settled that credit is to be given for time spent awaiting extradition on the subject offense. *State v. Bishop*, 2021-Ohio-2356 (7th Dist.), ¶ 24; *State v. Jacquillard*, 2013-Ohio-4778 (1st Dist.), ¶13; *State v. Painter,* 2009-Ohio-4929 (11th Dist.), ¶ 28.

*The jail time credit calculation*

**{¶94}** In the sentencing entry filed December 14, 2023, the trial judge awarded Williams 171 days of jail time credit. The trial judge did not elaborate on how she arrived at that figure.

**{¶95}** The record before this Court indicates that in Canton Municipal Court, Case No. 2023 CRA 1842, Williams was charged with Disrupting Public Services (F4) and Domestic Violence (F4). Williams was arrested on those charges on April 29, 2023, and

released on those charges at his initial appearance in the Canton Municipal Court on May 1, 2023.

**{¶96}** In Canton Municipal Court, Case No. 2023 CRA 1843, Williams was charged with Strangulation (F2), Abduction (F3), and Domestic Violence (F4). Williams was arrested on those charges on April 29, 2023, and was released on May 4, 2023, after posting a $100,000 surety bond.

**{¶97}** In Canton Municipal Court, Case No. 2023 CRA 1927, Williams was charged with three counts of Kidnapping (F1). Williams was arrested on those charges on May 5, 2023, and was released on May 8, 2023, after posting an unsecured bond of $25,000 with pretrial release supervision. Thereafter, on May 15, 2023, at Williams' preliminary hearing, the Canton Municipal Court committed Williams to the Stark County Jail and reset his bond to $150,000.

**{¶98}** On May 22, 2023, Williams was released from the Stark County Jail, after posting a $150,000 surety bond. On May 24, 2023, the state filed a motion to revoke Williams' bond, and on the same day, the trial judge revoked the bond and issued a capias for Williams'. Williams claims that he was arrested on that capias in the State of West Virginia on June 13, 2023, and was held in custody until his return to Stark County on June 30, 2023. He thereafter remained in custody at the Stark County Jail through his sentencing hearing on December 11, 2023. Thus, Williams contends he is entitled to credit as follows:

Arrest April 29, 2023 until May 4, 2023 released on bond:  6 days

Arrest May 5, 2023 until May 8, 2023 released on bond:   4 days

Bond reset May 15, 2023 until May 22, 2023 released on bond: 8 days

June 13, 2023 arrest on capias until December 11, 2023 sentencing: 182 days

**Total:** 200 days jail time credit

{¶99}  Accordingly, Williams claims he is entitled to twenty-nine days more jail time credit than the trial judge awarded to him. (200-171= 29).

{¶100} By invoking his R.C. 2967.191 right as entitling him to a particular result, a defendant puts the court and the state on notice of his claim and the alleged facts upon which the claim is grounded. It then becomes the state's burden to show that he is not so entitled because some or all of the days for which the defendant sought jail-time credit actually arose out of a set of facts separate and apart from the criminal conduct involved in his offense. *State v. Newport*, 2007-Ohio-1678 (2nd Dist.), ¶ 7; *State v. Painter,* 2009-Ohio-4929 (11th Dist.), ¶30, *citing State v. Naggy*, 2003-Ohio-6903 (2nd Dist.), ¶19. In this case, the state did not provide a basis for the trial judge's award of 171 days of jail time credit in response to William's motion in the trial court, or in its brief in this Court.

{¶101} Williams appends a newspaper article to his brief to support his assertion that he was arrested on the capias in West Virginia on June 13, 2023; however, "'[a]n exhibit merely appended to an appellate brief is not part of the record and we may not consider it in determining the appeal.'" *Williams v. Pioneer Credit Recovery, Inc.*, 2020-Ohio-397, (2nd Dist.), ¶ 16, *quoting State v. Grant*, 2013-Ohio-2981 (10th Dist.), ¶ 12; *State v. Stone,* 2022-Ohio-1117(2nd Dist.), ¶ 13. Accordingly, we have no factual basis for resolving the jail time credit computation.

{¶102} Where the record before the Court provides no basis to support the decision of the trial court regarding jail time credit, the case should be remanded to the trial court to calculate the amount of jail time credit and to place on the record its factual findings regarding its calculation. *State v. Newport,* 2007-Ohio-1678 (2nd Dist.), ¶7; *State v. Ott*, 2012-Ohio-4471, ¶28 (11th Dist.); *State v. Burden*, 2022-Ohio-569, ¶28 (12th Dist.). Therefore, given the nature of the record properly before this Court, we find it necessary to reverse the common pleas court's decision awarding Williams with 171 days of jail-time credit and remand this matter to the common pleas court for further proceedings.

{¶103} Upon remand, the common pleas court shall make a factual determination of the total, aggregate number of days of jail-time credit Williams is entitled to receive in accordance with R.C. 2967.191(A)(1), i.e., a factual determination of the total number of days of jail-time credit Williams was confined for any reason arising out of the offenses in this case. *State v. Newport,* 2007-Ohio-1678 (2nd Dist.), ¶7; *State v. Ott*, 2012-Ohio-4471, ¶28 (11th Dist.); *State v. Burden*, 2022-Ohio-569, ¶28 (12th Dist.) *State v. Bishop*, 2021-Ohio-2356, ¶34 (7th Dist.). This includes the time held awaiting extradition. The common pleas court shall make this decision based on the information already contained within the record, or, if the common pleas court deems it necessary, any additional testimony or documentary evidence submitted by the parties. Upon making this factual determination, the common pleas court shall then issue a written decision explaining how it arrived at its jail-time credit calculation, with proper citation to the record where possible, to allow this Court to conduct a meaningful review of its award of jail-time credit should that decision again be appealed to this Court. *Burden*, 2022-Ohio-569, ¶ 29.

{¶104} In so holding, we note that in order for this Court to be able to conduct a meaningful review of the common pleas court's jail-time credit calculation, we must be able to discern the analysis underlying the common pleas court's decision. This we cannot do with the record as it currently stands. Id. This is particularly true here when considering the common pleas court did not set forth any specific findings to support its decision awarding Williams with 171 days of jail-time credit within its December 14, 2023 Judgment Entry. Parenthetically, we further note the trial judge did not make any references to the record explaining how she ultimately came to the decision that she did when overruling by Judgment Entry filed January 11, 2024, Williams' pro se, handwritten, motion for jail time credit.

{¶105} Therefore, to the extent outlined above, Williams' Third Assignment of Error is sustained and this matter is remanded to the common pleas court for further proceedings in accordance with this opinion.

IV.

{¶106} In his Fourth Assignment of Error, Williams attempts to argue three separate and distinct assignments of error. First, Williams argues the trial judge erred in admitting State's Exhibit's 11 and 12, an ATM video that showed M.W. crying nine days before the events in this case took place. [Appellant's brief at 28]. Next, Williams contends the trial judge was required to sua sponte give a jury instruction on the inferior offense of strangulation resulting in physical harm. [Appellant's brief at 29]. Finally, Williams contends that he was denied a fair trial due to the cumulative errors made by the trial judge. [Appellant's brief at 29].

{¶107} Before addressing Williams' assignment of error, we must note the following procedural issue. In his appellate brief, Williams has failed to separately present and argue the three distinct assignments of error as required by App.R. 16(A)(7). App.R. 16(A)(7) requires an appellant to present and argue separate assignments of error. *Heigel v. MetroHealth Sys.*, 2024-Ohio-1471, ¶ 16 (8th Dist.); *State v. Emch*, 2023-Ohio-3553, ¶15 (5th Dist.). Although an appellate court may jointly consider assignments of error that are related, the parties do not have the same option and are required to separately present and argue each assignment of error. *Fiorilli Constr., Inc. v. A. Bonamase Contracting, Inc*, 2011–Ohio–107, ¶ 30 (8th Dist.); *Hyde v. Sherwin-Williams Co.*, 2011-Ohio-4234, ¶ 12 (8th Dist.). Therefore, we could exercise our discretionary authority to summarily overrule Williams' assignments of error. See, *Comisford v. Erie Ins. Property Cas. Co.,* 2011-Ohio-1373, ¶29 (4th Dist.); *Newman v. Enriquez*, 2007-Ohio-1934, ¶18 (4th Dist.); *Hyde v. Sherwin-Williams Co.*, 2011-Ohio-4234, ¶12 (8th Dist.); *Pahounds v. Beamer*, 2009-Ohio-6881, ¶65 (5th Dist.). However, we may consider assignments of error not separately presented in the interest of judicial fairness. *State v. Emch*, 2023-Ohio-3553, ¶15. We will do so in this case.

**Standard of Appellate Review – Admissibility of Evidence**

{¶108} "[A] trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence." *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271, 569 N.E.2d 1056 (1991). "However, we review de novo evidentiary rulings that implicate the Confrontation Clause. *United States v. Henderson*, 626 F.3d 326, 333 (6th Cir. 2010)." *State v. McKelton*, 2016-Ohio-5735, ¶97.

**Issue for Appellate Review:** *Whether the admission of State's Exhibits 11 and 12 were unfairly prejudicial to Williams and therefore denied him a fair trial*

**{¶109}** In *State v. Crotts*, the Ohio Supreme Court explained,

As a legal term, "prejudice" is simply "[d]amage or detriment to one's legal rights or claims." Black's Law Dictionary (8th Ed. 1999) 1218. Thus, it is fair to say that all relevant evidence is prejudicial. That is, evidence that tends to disprove a party's rendition of the facts necessarily harms that party's case. Accordingly, the rules of evidence do not attempt to bar all prejudicial evidence—to do so would make reaching any result extremely difficult. Rather, only evidence that is unfairly prejudicial is excludable.

"'Exclusion on the basis of unfair prejudice involves more than a balance of mere prejudice. If unfair prejudice simply meant prejudice, anything adverse to a litigant's case would be excludable under Rule 403. Emphasis must be placed on the word "unfair." Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision. Consequently, if the evidence arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish, the evidence may be unfairly prejudicial. Usually, although not always, unfairly prejudicial evidence appeals to the jury's emotions rather than intellect.'" *Oberlin v. Akron Gen. Med. Ctr.* (2001), 91 Ohio St.3d 169, 172, 743 N.E.2d 890, *quoting* Weissenberger's Ohio Evidence (2000) 85–87, Section 403.3.

2004-Ohio-6550, ¶ 23-24. We also note that any error will be deemed harmless if it did not affect the accused's "substantial rights." Before constitutional error can be considered harmless, we must be able to "declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967). Where there is no reasonable possibility that unlawful testimony contributed to a conviction, the error is harmless and therefore will not be grounds for reversal. *State v. Conway*, 2006-Ohio-791, ¶78, *citing Chapman*; State *v. Lytle*, 48 Ohio St.2d 391(1976), paragraph three of the syllabus, *vacated in part on other grounds Lytle v. Ohio, 438 U.S. 910, 98 S.Ct. 3135, 57 L.Ed.2d 1154 (1978). See also, State v. Jones*, 2012-Ohio-5677, ¶177.

{¶110} We conclude from a review of the entire record, that any error in the admission of the evidence was "harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18; *Harrington v. California*, 395 U.S. 250 (1969); *Schneble v. Florida*, 405 U.S. 427(1972). Williams was found guilty of only four of the original seventeen counts of the indictment. Williams does not explain how the video caused the jury to convict him of four counts, and yet find him not guilty with respect to eleven other counts with which he was charged.[4]

{¶111} We find from a thorough review of the record that the video was not so highly inflammatory and was not directed to the passions and prejudice of the jury. We find it extremely speculative that the video caused the jury to abandoned their oaths and their integrity and find Williams guilty of four of the crimes with which he was charged, and yet did not influence the jurors with respect to the other eleven charges under their consideration. We find there is no reasonable possibility that the videos contributed to

---

[4] The state dismissed two counts.

Williams' convictions for strangulation and domestic violence, and any error, therefore is harmless beyond a reasonable doubt.

*Plain Error*

{¶112} Williams next argues that, based upon the evidence presented at trial, the judge should have sua sponte given a lesser included jury instruction in regard the offenses of strangulation. By failing to do so, Williams argues that the judge plainly erred. [Appellant's Brief at 29].

{¶113} "To establish plain error, [Williams] must show that an error occurred, that the error was obvious, and that there is 'a reasonable probability that the error resulted in prejudice,' meaning that the error affected the outcome of the trial." (Emphasis omitted.) *State v. McAlpin*, 2022-Ohio-1567, ¶ 66, *quoting State v. Rogers*, 2015-Ohio-2459, ¶ 22. *Accord State v. Bailey*, 2022-Ohio-4407, ¶ 8. These elements are "conjunctive," meaning "all three must apply to justify an appellate court's intervention." *Bailey* at ¶ 9, *citing State v. Barnes,* 94 Ohio St.3d 21, 27(2002).

{¶114} The Court in *Rogers* reaffirmed that even if an accused shows the trial court committed plain error affecting the outcome of the proceeding, the appellate court is not required to correct it. Id. at ¶ 23. The Supreme Court stated:

> [W]e have "admonish[ed] courts to notice plain error 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *Barnes* at 27, 94 Ohio St.3d 21, 759 N.E.2d 1240, *quoting State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

*Rogers*, ¶ 23; *Accord, State v. Perry*, 101 Ohio St.3d 118, 120 (2004); *State v. Brook*, 2024-Ohio-3074, ¶ 82 (5th Dist.).

{¶115} We found in our disposition of Williams' Second Assignment of Error that the trial court did not commit plain error in failing to provide the jury the unrequested instructions, sua sponte. We further found that, even presuming that the instruction should have been given, under these circumstances the error was harmless beyond a reasonable doubt because sufficient evidence that Williams caused serious physical harm to M.W. was presented to the jury, and the jury convicted Williams of causing serious physical harm to M.W. Therefore, the result of the proceedings would not have been different even if the judge had given the instruction.

{¶116} We decline to find a manifest injustice warranting the extraordinary step of finding plain error in the trial judge's failure to sua sponte instruct the jury on the inferior offense of strangulation causing physical harm.

*Cumulative Error*

{¶117} In *State v. Brown*, 2003-Ohio-5059, the Ohio Supreme Court recognized the doctrine of cumulative error. "However, as explained in *State v. Bethel*, 2006-Ohio-4853, ¶ 197, it is simply not enough to intone the phrase 'cumulative error.'" *State v. Sapp*, 2004-Ohio-7008, ¶103. This Court has found that where the trial court did not err, cumulative error is simply inapplicable. *State v. Carter*, 2003–Ohio-1313, ¶37 (5th Dist.). To the extent that we have found that any claimed error of the trial court was harmless, we conclude that the cumulative effect of such claimed errors is also harmless because taken together, they did not materially affect the verdict. *State v. Leonard*, 2004-Ohio-6235, ¶ 185.

{¶118} Williams's Fourth Assignment of Error is overruled.

{¶119} The judgment of the Stark County Court of Common Pleas is affirmed, in part, and reversed, in part, and this case is remanded to that court for further proceedings in accordance with our opinion and the law.

By Gwin, P.J.,

Wise, J., and

King, J., concur